## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DEBRA MILLER and WILLIAM
THOMPSON, *individually, and on behalf of
all others similarly situated,*

                Plaintiffs,

    v.

1-800-FLOWERS.COM, INC.; ADAPTIVE
MARKETING, LLC; AFFINION GROUP,
LLC; APOLLO GLOBAL MANAGEMENT,
LLC; BANK OF AMERICA, N.A.;
BECKETT MEDIA LLC; BUY.COM, INC.;
CAPITAL ONE FINANCIAL
CORPORATION; CHASE BANK USA,
N.A.; CITIBANK, N.A.; CLASSMATES
INTERNATIONAL, INC.; DAYS INNS
WORLDWIDE, INC.; FTD GROUP, INC.;
IAC/INTERACTIVECORP, INC.; MEMORY
LANE, INC.; PEOPLEFINDERSPRO,
INC.; RAKUTEN USA, INC.;
SHOEBUY.COM, INC.; TRILEGIANT
CORPORATION, INC.; UNITED ONLINE,
INC.; VERTRUE, INC.;
WEBLOYALTY.COM, INC.; WELLS
FARGO & COMPANY; and WYNDHAM
WORLDWIDE CORPORATION,

                Defendants.

Case No.: _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

March 15, 2012

       Plaintiffs, Debra Miller and William Thompson ("Plaintiffs"), individually and on

behalf of all others similarly situated, allege, based upon personal knowledge,

information and belief, and the investigation of counsel, the following:

## NATURE OF THE ACTION

1.      This action is brought against Defendants, Trilegiant Corporation, Inc., its parent company, Affinion Group, LLC, and their controlling owner, Apollo Global Management, LLC, Vertrue, Inc., Webloyalty.com, Inc. and Adaptive Marketing, LLC (collectively "Trilegiant Enterprises" or "Trilegiant"), which, in conjunction with various e-commerce merchants or "marketing partners" such as Defendants, 1-800-Flowers.com, Inc., Beckett Media LLC, Buy.com, Inc., Classmates International, Inc., Days Inns Worldwide, Inc., FTD Group, Inc., IAC/Interactivecorp, Inc., Memory Lane, Inc., Peoplefinderspro, Inc., Rakuten USA, Inc., Shoebuy.com, Inc., United Online, Inc., Wells Fargo & Company and Wyndham Worldwide Corporation (collectively "Marketing Partners") and credit card companies such as Defendants, Bank of America, N.A., Capital One Financial Corporation, Chase Bank USA, N.A., and Citibank, N.A., (collectively "Credit Card Companies"), to levy unauthorized charges on consumers' credit and/or debit card accounts.

2.      Trilegiant purports to sell "memberships" to discount "clubs" including, but not limited to, LiveWell, Shoppers Advantage, Travelers Advantage, Great Fun!, Great Options, CompleteHome, Everyday Values, Everyday Privileges Gold, HealthSaver, Just For Me, Privacy Guard, IdentitySecure, CardCops, PC Safety/Plus, Hot-Line, Auto Vantage, and Buyers Advantage (collectively "Membership Clubs" or "Membership Programs"). In reality, Trilegiant is in the business of creating confusion surrounding these Membership Clubs with the ultimate goal of  luring consumers, by fraud and trickery, into enrolling in and paying fees to such "clubs" which are illusory in nature and ultimately provide no services.

3.      By engaging in these practices for years, Trilegiant's actions have subjected the company (as well as its affiliates, subsidiaries, and parent companies) to Congressional hearings and prior governmental investigations; specifically, a sixteen-state attorney general investigation, which ultimately yielded an injunction expressly prohibiting Trilegiant from engaging in the practices complained of herein. Its business practices are well known to the e-merchant community and to the Credit Card Companies, each of whom is an essential part of and participant in Trilegiant's fraudulent scheme. Despite the previous sixteen-state attorney general settlement, and other governmental investigations, Trilegiant has continued to operate its scheme. Further, the Marketing Partners continue to receive revenue from their participation in Trilegiant's scheme, and the Credit Card Companies continue to process charges from Trilegiant despite their knowledge of Trilegiant's fraudulent business practices.

4.      Trilegiant's fraudulent marketing scheme consists of at least five common features:

  a.      **Purchasing Access to E-merchants' Checkout Process;**

  b.      **Soliciting Consumers Through Post-Transaction Offers;**

  c.      **Using a Data-Pass Technique to Share Private Consumer Data;**

  d.      **Enrolling in Negative-Option Billing Practices; and**

  e.      **Implementing Refund Mitigation Policies.**

5.      Several of these techniques are considered patterns of fraudulent conduct, and have promoted numerous governmental investigations, including, but not limited to, the sixteen-state attorney-general investigation, the Senate Commerce Committee's Supplemental Report on Aggressive Sales Tactics on the Internet

published on May 19, 2010, and the Restore Online Shoppers' Confidence Act recently passed by Congress.

### Purchasing Access to Marketing Partners' Checkout Process

6.      Trilegiant functions by contracting with its Marketing Partners to let Trilegiant interpolate itself into the checkout process when consumers such as Plaintiffs are in the process of completing their purchases. Trilegiant pays the Marketing Partner a fee for giving Trilegiant access to the checkout process so that Trilegiant can carry out its scheme. These fees paid to Marketing Partners are substantial—Congressional records indicate that Defendant, Memory Lane, Inc. (operating its business as Classmates.com), was paid in excess of $70 million from Trilegiant. Other Defendants, including 1-800-Flowers and FTD, have been paid at least $10 million from Trilegiant.

### Soliciting Consumers Through Post-Transaction Offers

7.      As is common in internet sales transactions, when a consumer is ready to complete his or her purchases from Trilegiant's Marketing Partners, the consumer is prompted to input his or her confidential billing information, including his or her credit or debit card numbers. Once the consumer is done providing his or her credit card information, but prior to confirming the sales transaction with the e-merchant, Trilegiant often inserts its membership program offers with a promise of an upfront gift, such as cash back rewards. Because of the positioning of these "post-transaction offers" in the purchase process, the customers are led to believe, in this example, that they are completing the original transaction with the Marketing Partner.

8.      Not only is the positioning of these "post-transaction offers" confusing and misleading, but when disclaimers, opt-out links, or other text that would allow a

consumer to evade Trilegiant's offer are displayed, such text is displayed in a color matching, or very similar to, the background of the web page, in order to remain unnoticed or undetected.

### Using a Data-Pass Technique to Share Private Consumer Data

9.      At the heart of Defendants' fraudulent marketing scheme lies a "data pass" arrangement where a consumer can be enrolled in Trilegiant's membership program without ever directly providing his or her credit card information. Instead, Trilegiant's Marketing Partners, pursuant to their partnership agreement with Trilegiant, pass on the consumer's credit card information to Trilegiant without the consumer's knowledge or consent and without any form of communication between the e-merchant and the consumer authorizing this "data pass."

10.     This practice is particularly shocking, as it could allow consumers' personal credit card information to be disseminated to other parties without their knowledge or consent.

11.     As discussed more in detail below, this practice prompted a Senate investigation which ultimately led to Congress passing the Restore Online Shoppers' Confidence Act to expressly prohibit conduct of this nature.

### Enrolling in Negative-Option Billing Practices

12.     Once the consumer is unwittingly enrolled in one or more of Trilegiant's membership programs, Trilegiant begins to automatically charge the consumer's credit or debit card, again without the consumer's authorization. The credit card company then processes these unauthorized charges and debits the consumer's account, despite evidence that Trilegiant is in violation of various credit card rules.

13.     Trilegiant will continue assessing, and the credit card company will continue processing, these unauthorized charges unless and until the consumer actively opts out of the membership program. This practice is known as a "negative option" and can result in Trilegiant charges of $11.99 or more per month continuing, sometimes for several months or more, until the consumer: a) detects the unauthorized charge on his or her statement; b) contacts Trilegiant to cancel the membership program; and c) is able to effect cancellation, despite Trilegiant's resistance, delaying tactics and obfuscation.

14.     As discussed more in detail below, this practice prompted a Senate investigation which ultimately led to Congress passing the Restore Online Shoppers' Confidence Act to expressly prohibit conduct of this nature.

### Implementing Refund Mitigation Policies

15.     Knowing that the consumer will attempt to seek immediate cancellation, as well as a full refund, upon discovering that they have been inadvertently enrolled in these membership programs and charged unauthorized monthly fees, Trilegiant employs various tactics to minimize the amount of refund to be issued to the consumer. These tactics include training call center employees to quickly cancel without a refund as soon as a customer complains, and demanding the request for cancellation be in writing.

16.     According to the Supplemental Report, "[w]hen consumers finally realized that [one of the Trilegiant Enterprises was] charging them, [these Trilegiant Enterprises] withheld important information about the charges from consumers and made it as difficult as possible for consumers to get their money back.

**Government Investigations**

17.     Defendants have received thousands of consumer complaints regarding their fraudulent marketing scheme dating back prior to the 2006 attorney general investigation and continuing through to the present. In fact, the pattern of Defendants' fraudulent conduct is so pronounced that various governmental authorities, including the United States Senate Committee on Commerce, Science, and Transportation (the "Senate Commerce Committee") and the then-New York Attorney General Andrew M. Cuomo, have launched official investigations into Trilegiant and its affiliated e-merchants' online business practices.

18.     The Senate Commerce Committee issued a Staff Report entitled, "Aggressive Sales Tactics on the Internet and Their Impact on American Consumers," published on November 16, 2009. This report concluded that:

> Affinion[/Trilegiant] . . . use[s] aggressive sales tactics intentionally designed to mislead online shoppers. [Trilegiant] exploit[s] shoppers' expectations about the online purchasing process to charge millions of consumers each year for services the consumers do not want and do not understand they have purchased. Hundreds of e-commerce merchants—including many of the best-known, respected websites and retailers on the Internet—allow [Trilegiant] to use aggressive sales tactics against their customers, and share in the revenues generated by these misleading tactics.

19.     The Senate Commerce Committee published a second report on May 19, 2010 entitled, "Supplemental Report on Aggressive Sales Tactics on the Internet," based on the information provided by e-merchants. The Supplemental Report concluded that the e-merchants have engaged in deceptive conduct and have violated credit card company rules by automatically transferring customers' credit card information to Trilegiant.

20.     The Supplemental Report described Trilegiant's practices as a two-step business model:  (1) use deceptive sales tactics to charge consumers' credit and/or debit card accounts; and (2) after consumers discover the unauthorized charges, refund as little of their money as possible.

21.     These new investigations follow on the heels of the settlements Trilegiant reached with sixteen attorneys general in 2006 that required Trilegiant to cease certain business practices, including offering "free" or "no obligation" trial memberships in the same Membership Programs at issue here through direct mail solicitations, without disclosing that cashing the enclosed check for a nominal amount automatically enrolls the consumer in the Membership Program and the consumer will be charged automatic monthly fees until the consumer affirmatively acts to cancel. The Trilegiant Enterprises have continue these fraudulent business practices, or modified such practices slightly into their current form in some cases, which have given rise to these new investigations and to this class action lawsuit.

22.     In response to the various government investigations into Trilegiant, Congress passed, and the President signed, the Restore Online Shoppers' Confidence Act which expressly bans Trilegiant's data-pass and negative option billing practices, among other things.

23.     As a result of Defendants' conduct described above and further described throughout this Complaint, Plaintiffs and members of the putative Plaintiff Class have been damaged by incurring charges for "memberships" to Trilegiant "clubs" that they never wanted or used. Further, these so-called "clubs" have little or no actual value.

24.     Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated whose credit, debit or other accounts have been assessed "membership fee" charges as a result of Defendants' fraudulent scheme, bring these claims against Defendants for: (a) violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; (b) conspiring to violate RICO, 18 U.S.C. § 1962(d); (c) aiding and abetting violations of RICO, 18 U.S.C. §§ 1961-1968; (d) aiding and abetting violations of 18 U.S.C. § 1341 (mail fraud), violations of 18 U.S.C. § 1343 (wire fraud), and violations of 18 U.S.C. § 1344(2) (bank fraud); (e) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq.*; (f) aiding and abetting violations of ECPA, 18 U.S.C. § 2510, *et seq.*; (g) violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a ("CUTPA"); (h) aiding and abetting violations of  CUTPA; (i) violations of the California Automatic Purchase Renewal Act, Cal. Bus. & Prof. Code § 17602; and (j) unjust enrichment.

25.     Plaintiffs seek, *inter alia*: an order certifying the proposed Plaintiff Class and Defendant Class under Rule 23 of the Federal Rules of Civil Procedure; an order appointing Plaintiffs and their counsel of record to represent the Plaintiff Class; restitution, statutory damages, and injunctive and declaratory relief on behalf of Plaintiffs and the Plaintiff Class; and any such further relief as the Court may deem proper under the circumstances.

## JURISDICTION AND VENUE

26.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States, namely, 18 U.S.C. §§ 1961-1968 (RICO) and 18 U.S.C. § 2510, et seq. (ECPA). This Court has supplemental

jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims for violations of CUTPA, C. G. S. § 42-110a, et seq., and for unjust enrichment.

27.     This Court also has original jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d), because in the aggregate, the amount in controversy exceeds the jurisdictional minimum amount of $5,000,000.00, exclusive of interest and costs, there are at least 100 members in the proposed Plaintiff Class, and at least one member of the Plaintiff Class is a citizen of a different state than Defendants.

28.     This Court has general and specific jurisdiction over Defendants. Defendants are, and at all relevant times were, engaged in unfair business practices and a racketeering enterprise directed at and/or causing injury to persons residing, located or doing business throughout the United States, including in this District. The jurisdiction is proper pursuant to 18 U.S.C. § 1965(b), which establishes nationwide jurisdiction in RICO claims.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District, and/or because Defendants have sufficient contacts with this District.

## PARTIES

30.     Plaintiff, Debra Miller ("Miller"), is, and at all relevant times was, a citizen of North Dakota.  During the Class period, Miller's credit and/or debit card was unlawfully charged by Trilegiant's "Great Fun!" membership club, after purchasing some textbooks online from one of the Marketing Partners in June 2010.  Once Miller was unknowingly "enrolled" in the Membership Clubs, her credit and/or debit card account was charged a monthly fee ranging from $12.00 to $13.99 until February 2012.  Upon becoming aware

of the unlawful charges, Miller contacted Capital One, her credit card provider, and Trilegiant in an attempt to obtain a refund of these charges. Trilegiant and Capital One both refused to refund these charges, prompting Miller to pursue further legal action.

31.     Plaintiff, William Thompson ("Thompson"), is, and at all relevant times was, a citizen of Massachusetts. During the Class period, Thompson's credit and/or debit card account was unlawfully charged by Webloyalty's "Reservation Rewards" membership club and Webloyalty's "Shopper Discount" club, after making purchases from one of the Marketing Partners. Once Thompson was unknowingly "enrolled" in the Membership Clubs, his credit and/or debit card account was charged a fee in the amount of $10.00 per club, each month thereafter.

32.     At no point during Plaintiffs' transactions with the Marketing Partners, or at any point thereafter, did Plaintiffs provide their consent to charge their credit and/or debit card accounts for allegedly enrolling in these Membership Clubs.

33.     1-800-Flowers.com, Inc. is a corporation established under the laws of the State of Delaware, with its principal place of business located in New York. 1-800-Flowers.com, Inc. is an online merchant conducting business over the Internet throughout the United States.

34.     Adaptive Marketing, LLC is a limited liability company established under the laws of the State of Delaware, with its principal place of business located in Connecticut. Adaptive Marketing, LLC is a wholly owned subsidiary of Vertrue, Inc.

35.     Affinion Group, LLC is a limited liability company established under the laws of the State of Delaware, with its principal place of business located in

Connecticut. Affinion Group, LLC markets club memberships under the auspices of its subsidiary, Trilegiant Corporation, Inc.

36.     Apollo Global Management, LLC is a limited liability company established under the laws of the State of Delaware, with its principal place of business located in New York. According to Affinion's Form 10-K filed with the Securities Exchange Commission:

> **We are controlled by Apollo who will be able to make important decisions about our business and capital structure.**
>
> Approximately 69% of the common stock of [Affinion] is beneficially owned by investment funds affiliated with Apollo. As a result, Apollo controls us and has the power to elect a majority of the members of our board of directors, appoint new management and approve any action requiring the approval of the holders of Holdings' stock, including approving acquisitions or sales of all or substantially all of our assets. The directors elected by Apollo have the ability to control decisions affecting our capital structure, including the issuance of additional capital stock, the implementation of stock repurchase programs, the declaration of dividends and the purchase of our indebtedness or Holdings' indebtedness, in each case, subject to the terms of our senior secured credit facility and the indentures governing our notes. Additionally, Apollo is in the business of investing in companies and may, from time to time, acquire and hold interests in businesses that compete directly or indirectly with us. Apollo may also pursue acquisition opportunities that may be complementary to our business and, as a result, those acquisition opportunities may not be available to us.

(emphasis in original).

37.     Bank of America, N.A. is a corporation established under the laws of the State of Delaware, with its principal place of business located in North Carolina. Bank of America, N.A. is a wholly owned subsidiary of Bank of America Corporation. Bank of America, N.A. is the legal entity for Bank of America Corporation's credit card business. Bank of America, N.A. is one of the largest credit card companies in the United States, with millions of credit card customers throughout the United States.

38.     Beckett Media LLC is a limited liability company established under the laws of the State of Delaware, with its principal place of business located in Texas. Beckett Media LLC operates its business of buying and selling various sports memorabilia through its website, Beckett.com.

39.     Buy.com, Inc. is a corporation established under the laws of the State of Delaware, with its principal place of business located in California. Buy.com, Inc. operates its e-commerce business of providing technology and entertainment retail goods as a fully owned subsidiary of Rakuten USA, Inc.

40.     Capital One Financial Corporation is a corporation established under the laws of the State of Delaware, with its principal place of business located in Virginia. Capital One Financial Corporation is one of the largest credit card companies in the United States, with millions of credit card customers throughout the United States.

41.     Chase Bank USA, N.A. is a corporation established under the laws of the State of New York, with its principal place of business located in New York. Chase is a wholly owned subsidiary of JP Morgan Chase & Co. ("JPM"). Chase is the legal entity for JPM's credit card business. Chase is one of the largest credit card companies in the United States, with millions of credit card customers throughout the United States.

42.     Citibank, N.A. is a corporation established under the laws of the State of Delaware, with its principal place of business located in New York. Citibank, N.A. is a wholly owned subsidiary of Citigroup Inc., and is one of the largest credit card companies in the United States, with millions of credit card customers throughout the United States.

43.     Classmates International, Inc., doing business as Classmates Online, Inc., is a corporation established under the laws of the State of Delaware, with its principal place of business located in Washington.

44.     Days Inns Worldwide, Inc. is a corporation established under the laws of the State of New Jersey, with its principal place of business located in New Jersey. Days Inns Worldwide, Inc. is a wholly-owned subsidiary of Wyndham Worldwide Corporation.

45.     FTD Group, Inc., doing business as FTD.com, Inc., is a corporation established under the laws of the State of Delaware, with its principal place of business located in Illinois.

46.     IAC/Interactivecorp, Inc. is a corporation established under the laws of the State of Delaware, with its principal place of business located in New York. IAC acquired Shoebuy.com in 2006 as its wholly-owned business subsidiary. IAC operates its business through Shobuy.com.

47.     Intelius, Inc. is a corporation established under the laws of the State of Delaware, with its principal place of business located in Washington.  Intelius, Inc. was involved in marketing the club memberships complained of herein.

48.     Memory Lane, Inc., doing business as Classmates.com, is a corporation established under the laws of the State of Washington, with its principal place of business located in Washington.

49.     PeopleFindersPro, Inc. is a corporation established under the laws of the State of California, with its principal place of business located in California. PeopleFindersPro, Inc. operates its business of obtaining public records for people through its website, PeopleFinders.com.

50.     Rakuten USA, Inc. is a corporation established under the laws of the State of Delaware, with its principal place of business located in Massachusetts. Rakuten USA, Inc. provides an online marketplace for the sale of goods and services, and is the parent company of Buy.com, Inc.

51.     Shoebuy.com, Inc. is a corporation established under the laws of the State of Delaware, with its principal place of business located in Massachusetts, and is a wholly-owned subsidiary and an operating business of IAC.

52.     Trilegiant Corporation, Inc. is a corporation established under the laws of the State of Delaware, with its principal place of business located in Connecticut, and is a subsidiary of Affinion. Trilegiant Corporation, Inc. markets the club memberships complained of herein.

53.     United Online, Inc. is a corporation established under the laws of the State of Delaware, with its principal place of business located in California. In 2004, United Online, Inc. acquired Classmates Online, Inc. (whose name was recently changed to Memory Lane, Inc.). In August 2008, United Online, Inc. acquired FTD Group, Inc.

54.     Vertrue, Inc. is a corporation established under the laws of the State of Delaware, with its principal place of business located in Connecticut. Vertrue, Inc. markets club memberships complained of herein under the auspices of its subsidiary, Adaptive Marketing, LLC.

55.     Webloyalty.com, Inc. is a corporation established under the laws of the State of Delaware, with its principal place of business located in Connecticut. Webloyalty.com, Inc. is a wholly owned subsidiary of Affinion, and markets the club memberships complained of herein.

56.     Wells Fargo & Company is a corporation established under the laws of the State of Delaware, with its principal place of business located in California.  Wells Fargo & Company markets Trilegiant Membership Clubs through an Identity Theft Protection program in its Wells Fargo Insurance division.

57.     Wyndham Worldwide Corporation is a corporation established under the laws of the State of Delaware, with its principal place of business located in New Jersey.  Wyndham Worldwide Corporation wholly owns Days Inns Worldwide, Inc., and controls its day-to-day hospitality business operations.

## STATEMENT OF FACTS

### A. Trilegiant Enterprises and their Marketing Partners

58.     Trilegiant, which started out as Comp-U-Card ("CUC") in 1973, merged with HFS Incorporated in 1997 to form Cendant Corporation ("Cendant"). Immediately after this merger, it was disclosed that CUC had engaged in a massive accounting fraud, embroiling Cendant in one of the largest securities actions at the time. In 2005, Cendant sold Trilegiant to Apollo Management, which subsequently renamed Trilegiant as Affinion Group in 2006.  Affinion later acquired Webloyalty.com, Inc.

59.     Since the inception of its predecessor in 1973, Trilegiant has been engaged in the business of marketing and selling membership programs that allegedly provide "members" with the opportunity to obtain discounts on various goods and services for a recurring membership fee, usually ranging between $10 and $30 a month, assessed against the consumer's credit or debit cards. The membership programs marketed and sold by Trilegiant include, *inter alia*, the following:  LiveWell, Shoppers Advantage, Travelers Advantage, Great Fun!, Great Options, CompleteHome, Everyday Values, Everyday Privileges Gold, HealthSaver, Just For Me, Privacy Guard,

IdentitySecure, CardCops, PC Safety/Plus, Hot-Line, Auto Vantage, and Buyers Advantage (collectively "Membership Program(s)" or "Membership Club(s)").

60.     Trilegiant's business is highly profitable. In the third quarter of 2010 alone, Trilegiant has recorded revenue of over $170 million from the sale of its Membership Programs.

61.     Because there is no significant market, demand or use for these Membership Programs, much of Trilegiant's success is directly attributable to its ability to fraudulently and deceptively stick consumers with unauthorized charges for the Membership Programs that consumers neither requested nor authorized.

62.     All of Trilegiant's tactics of  fraudulently and deceptively imposing unauthorized charges  share a common, indispensable element for their success: a variety of strategic alliance partnerships with third parties, such as various e-merchants, including the above-named Defendant Marketing Partners, and credit card companies, including Defendant Credit Card Companies, to obtain access to, and process charges on, the consumers' confidential billing information.

63.     Because of its pervasive use of these tactics designed to charge consumers for the Membership Programs without their knowledge or consent, Trilegiant has been the subject of numerous law enforcement actions and private lawsuits, including, but not limited to, the following:

       a.     Florida Attorney General Charlie Crist reached a settlement with Trilegiant in March 2005, the terms of which required Trilegiant to "provide compensation to consumers wronged by the company's tactics in marketing

various club memberships," as well as $400,000.00 to the State of Florida for its attorneys' fees, costs of investigation, and continued supervision.

b.      In a prior class action lawsuit brought by private individuals, an Illinois state court granted final approval of a nationwide class action lawsuit against Trilegiant, under which Trilegiant agreed to pay up to $25 million in refunds.

c.      California Attorney General Bill Lockyer also instituted a legal proceeding against Trilegiant and Chase Bank for "mislead[ing] consumers into becoming members of various membership programs without the consumers' knowledge or consent." Their investigation discovered that Trilegiant had agreements with Chase Bank to gain access to Chase Bank's customers and market the membership programs. Pursuant to these agreements, Trilegiant used Chase Bank's name in mailings, and Chase Bank reviewed and approved marketing materials. On December 12, 2006, 16 state attorneys general[1] joined a $14.5 million settlement against Trilegiant and Chase Bank.

d.      In August 2010, New York Attorney General Andrew M. Cuomo reached a settlement against Trilegiant for $10 million for tricking hundreds of thousands of New York consumers into signing up for discount clubs that charged hidden fees.

64.      Under the settlement agreement reached with 16 state attorneys general in December 2006, Trilegiant was enjoined from directly marketing the Membership

---

[1] The states involved in the settlement were: Alaska, California, Connecticut, Illinois, Iowa, Maine, Michigan, Missouri, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Vermont, and Washington.

Programs through mail solicitations without making certain changes to its practice, including, *inter alia*:

      a.     Disclosures regarding cancellation methods in a negative option billing practice, all in a clear and conspicuous manner such as inserting the disclosure language in the first paragraph of the main body in bold type compared to other text on the page;

      b.     Ensuring that no false or misleading representation is made to the consumers that the solicitation is a refund, rebate, reward or other benefit conferred because of a business relationship between a third party merchant and the consumer or that the solicitation was service or benefit offered by any entity other than Trilegiant;

      c.     Ensuring that membership materials clearly and conspicuously disclose, in bold face or underlined type, that the consumer has purchased a membership in a Membership Program, and that the consumer has a certain number of days to cancel the membership in order to avoid being charged for the membership;

      d.     Prior to billing a consumer for a membership charge, first obtain the consumer's unambiguous, express, and affirmative written consent to charge a membership charge to an account, either immediately or upon the expiration of a trial offer, unless the consumer affirmatively cancels his or her membership;

      e.     Promptly credit or refund, in accordance with the cancellation policy, the amount of any unauthorized membership charge without requiring

additional action by the consumer (other than requesting that the consumer provide information necessary to process the cancellation); and

      f.      That Trilegiant shall not enter into, continue, or renew any contract with any third party for the purpose of marketing Membership Programs that do not comply with all the injunctive provisions of the settlement agreement.

65.      Similarly, the settlement agreement reached between then-New York Attorney General Andrew M. Cuomo and Trilegiant required Trilegiant to:

      a.      Fully refund fees charged to consumers who unknowingly enrolled in or authorized billing for Trilegiant discount clubs and programs;

      b.      Permanently end its practice of marketing discount clubs and programs by mailing checks to New York residents;

      c.      Permanently end its practice of obtaining consumers' billing information from online partner retailers;

      d.      Reform its online marketing practices to ensure consumers understand they are enrolling in a program offered by Trilegiant for which they will be billed; and

      e.      Make redemption forms for rebates immediately available to consumers online.

## B. Continued Violations by Trilegiant Enterprises, Marketing Partners, and Credit Card Companies After Attorney General Investigations

66.      Despite being on notice that its marketing scheme is fraudulent, unfair, deceptive, and unlawful by virtue of its 2006 settlement with sixteen state attorneys general, Trilegiant attempts to evade the settlement injunctions by using online transactions, as opposed to the interstate mail system, to continue a virtually identical

fraudulent and deceptive marketing scheme to sell its Membership Programs without the consumers' knowledge, and to charge recurring membership fees without the consumers' proper consent.

67.     As explained in the Supplemental Report, "[t]he goal of these [Membership Programs] was not to provide services, but to charge consumers' credit cards for as many months as possible before consumers discovered their memberships and cancelled them."

68.     The mechanics of the partnership agreements between the Trilegiant Enterprises and the Marketing Partners are the same in each agreement. In exchange for a substantial portion of the revenue generated by selling the Membership Programs, the partner companies not only allow Trilegiant to market and sell the Membership Programs to their customers, but also provide access to the customers' private billing information, including their credit or debit card account numbers.

69.     Once the partnership agreement is in place, Trilegiant's fraudulent marketing scheme to sell its Membership Programs goes through several uniform steps to achieve its common goal of "charg[ing] consumers' credit cards for as many months as possible before consumers discover[] their memberships and cancel[] them."

70.     First, employing a deceptive tactic known as "post transaction" marketing, Trilegiant and numerous e-merchants have uniformly created a false and deceptive appearance that these offers for discount Membership Programs are part of the consumers' original transactions with the e-merchants. Such post-transaction marketing uses, inter alia: (1) "interstitial" sales offer pages from Trilegiant, which appear between the checkout page and the confirmation page while the customers are completing their

transactions on the e-merchant's website; (2) "pop up" windows with the offers which appear on top of the e-merchant's confirmation page; and (3) a hyperlink to an enrollment offer (or "banners") that are included on the e-merchant's confirmation page.

71.     Any opt-out hyperlinks or other form of so-called "disclaimers" displayed by Trilegiant are done  using text that is the same color as the background, or using a color that is indistinguishably similar, in order to reduce the detectability and/or noticeability of such language.

72.     Second, once the consumers have been duped into believing that the Membership Program offers are from the e-merchants, Trilegiant uniformly allows the enrollment to go forward without ever requiring the consumers to enter their credit or debit card account information.

73.     As such, Trilegiant never obtains access to the consumers' credit card information directly from the consumers themselves. Instead, under the terms of the partnership agreement between the e-merchants and Trilegiant, the e-merchants provide Trilegiant with full, unfettered access to the consumers' credit card information, even though the consumers never intend to directly provide such information to Trilegiant. This fraudulent tactic is known as "data pass" marketing.

74.     Because the consumer never has to enter any of his or her credit card information, they reasonably believe that they have not made any additional purchases apart from their original transaction with the e-merchant. According to the National Association of Attorneys General, requiring a consumer to re-enter his or her credit card information "is a readily recognizable means for a consumer to signal assent to a deal" which gives the consumers the ultimate say over their purchase decisions. Likewise, a

Harvard Business School Professor, Benjamin Edelman, recently opined to the Senate Commerce Committee that "[consumers] rightly expect . . . they cannot incur financial obligations except by typing their credit card numbers."

75.     Third, exploiting the fact that the consumers are completely unaware of their inadvertent enrollment in these Membership Programs, Trilegiant uniformly employs a deceptive billing process known as "negative option" where the consumer's credit card will be automatically charged a monthly fee unless and until the consumer takes affirmative steps to cancel the membership. The only indication on the offer page that Trilegiant engages in such negative option billing process is in exceedingly fine print that is specifically designed not to attract the consumer's attention.

76.     Affirmative consumer action is impossible until consumers actually become aware that they have been  enrolled in the Membership Program, which does not occur until months, if not years, after Trilegiant first begins to charge recurring membership fees. Furthermore, the common, distinctive feature of Trilegiant's Membership Programs, *i.e.*, that they merely provides "access" to benefits, as opposed to periodic receipt of tangible goods, creates special hazards for consumers enrolled on a negative option basis, especially when the consumers are not even aware of purchasing "access" in the first instance.

77.     Fourth, Trilegiant uniformly employs various tactics  to minimize the amount of improper charges they would have to refund to the millions of confused and angry consumers who eventually discover that they have been unknowingly enrolled in the Membership Programs and charged unauthorized monthly fees.

78.     On information and belief, in addition to maintaining its own call centers, Trilegiant hires other companies for the specific purpose of minimizing the number of membership cancellations by employing a specific protocol to handle the thousands of consumer calls it receives each day. These call center employees are incentivized to turn away these angry Trilegiant customers by  promises of a bonus payment for every customer that they "save," and threats of termination if the "save" rate falls below certain threshold percentage.

79.     On information and belief, rather than informing the customers of  the real method by which they were "enrolled" into these Membership Programs, these call center employees are specifically instructed to tell the customers that they somehow signed up for the Membership Programs through their credit card company. If a customer tries to cancel a membership with Trilegiant, the employee is instructed to keep the customer by going through several "rebuttal" steps. They must do at least two rebuttals, selling the customer on the service provided by maintaining the membership with Trilegiant. If a customer uses key words such as "fraud," "attorney," "attorney general," or "lawsuit," these call center employees are instructed to transfer the call to a manager. Even though these employees are not allowed to issue more than a two month refund under any circumstances, a manager will often issue a full refund to those customers who persist in their request for refund by repeatedly using certain key words.

80.     As a result of this uniform, fraudulent marketing scheme, consumers are wrongfully and deceptively charged by Trilegiant for the Membership Programs, do not knowingly consent to purchasing or being billed for Trilegiant's Membership Programs,

and do not provide Trilegiant with valid authorization, in writing or otherwise, to withdraw funds from or assess charges against the consumers' credit, debit, or other accounts.

**C. Credit Card Companies and Marketing Partners Ignored Attorney General Investigations and Prior Negative Publicity Concerning Trilegiant Enterprises.**

81.    Credit card companies not only have the ability to protect their customers' accounts from fraudulent charges by using sophisticated anti-fraud software, but they also have various merchant rules in place that are designed to identify and prevent fraudulent merchants from accepting unauthorized credit card transactions.

82.    Professor  Edelman supplemented his initial statement to the Senate Commerce Committee with a subsequent work entitled, "Payment Card Network Rules Prohibit Aggressive Post-Transaction Tactics," in which he notes:

> American Express's Merchant Reference Guide prohibits the automatic transfer of customers' card numbers. American Express rules provide that "Merchants . . . must not disclose Cardmember Information . . . other than to facilitate Transactions in accordance with the Agreement" (p.7) (emphasis added). No provision of the agreement authorizes a merchant to transfer a customer's card number to another merchant. Furthermore, for a card-not-present charge, a merchant "must . . . ask the Cardmember to provide: . . . Card Number" (p.12) (emphasis added). No provision authorizes a merchant to obtain a customer's card number in any way other than by asking the customer to provide such number. Thus, post-transaction marketers violate American Express policies when they obtain customer card numbers by making copies from other merchants.

*Id.* (emphasis in original).

83.    Likewise,

> Visa's Rules for Merchants prohibit the automatic transfer of customers' card numbers. Visa rules provide that a charge may occur after "the cardholder provides the merchant with the account number" (emphasis added) (p.7) (emphasis added). No rule authorizes charges without the cardholder providing an account number. Furthermore, Visa requires that merchants "keep cardholder account numbers and personal information confidential" and provide that such information "should be released only to your merchant bank or processor, or as specifically required by law" (p.12)

(emphasis added). Transferring a card number to a post-transaction marketer does not fit any of these narrow exceptions and is therefore prohibited.

. . .

Visa's Rules for Merchants require merchants to request payment card expiration dates. Visa states: "Whenever possible, card-not-present merchants should ask customers for their card expiration . . . date" (p.40) (emphasis added). It is certainly "possible" for post-transaction marketers to ask customers for their card expiration dates, but post- transaction marketers do not do so. Through this failure, post-transaction marketers fall further short of applicable Visa requirements.

. . .

Visa's Rules for Merchants require notification to each customer before each periodic charge. For all recurring transactions, Visa indicates that merchants should "notify the customer before billing . . . at least 10 days in advance [of each billing] ... [includ[]ing] the amount to be charged" (p.52) (emphasis added). While Visa describes this notification as optional ("should"), the principle is clear: Notify customers before each charge so they have a meaningful and timely opportunity to decline. In contrast, post-transaction marketers routinely charge customers' Visa cards without such notification.

. . .

Visa's Rules for Merchants require that a merchant confirm a customer's preferred payment method. Under a rule entitled "Confirm the Choice," Visa explains a merchant's obligation: "To avoid any kind of misunderstanding about the customer's choice of payment, merchants should include a confirmation page or voice confirmation that specifies the payment option selected (e.g., Visa, Mastercard, Star, etc)" (p.15) (emphasis added). While Visa describes this confirmation as optional ("should"), the principle is clear: Confirmation pages provide an important mechanism for confirming a customer's intent to enter a paid relationship. By skipping such confirmation, post- transaction marketers violate Visa's guidelines.

*Id.* (emphasis in original).

84.     Likewise,

MasterCard's Rules specifically disallow automatic transfer of customers' card numbers. MasterCard rules provide that "a Merchant must not sell, purchase, provide, exchange or in any manner disclose Card account

number, Transaction, or personal information of or about a Cardholder to anyone other than its Acquirer, to the Corporation, or in response to a valid government demand." Transferring a card number to a post-transaction marketer does not fit any of these narrow exceptions and is therefore prohibited.

. . .

MasterCard's Rules require each merchant to clearly notify consumers of the name and identity of the company that will charge their cards. MasterCard requires that merchants "prominently and unequivocally inform[] the Cardholder of the identity of the Merchant . . . so that the Cardholder can readily distinguish the Merchant from any other party." In particular, MasterCard requires that the Merchant's site must "prominently display the name of the Merchant . . . as prominently as any other information depicted on the Web site." In contrast, post-transaction marketers widely fail to present their names with the requisite prominence.

*Id.* (emphasis in original).

85.     Trilegiant's entire business model is based on violating these credit card merchant rules. Trilegiant and its e-merchant partners repeatedly violated, and continue to violate these rules and have generated high volumes of customer complaints, triggering fraud warnings and/or fraud monitoring procedures within the credit card companies.

86.     Despite the evidence that Trilegiant's business practices did not meet the credit card companies' merchant rules, and despite the credit card companies' knowledge that Trilegiant membership "club" charges are among the highest sources of complaints brought to the attention of its fraud monitoring group, the credit card companies continued to process millions of questionable credit and debit charges every month without first verifying the charges with the account holder, as the credit card companies do with any number of other questionable credit card and debit card account charges.

87.     The Supplemental Senate Report states:

27

Evidence the Committee received from . . . American Express shows that the data pass process and other practices employed by [Trilegiant] and their e-commerce partners violated the credit card companies' operating rules and generated high volumes of customer complaints. [Trilegiant] has triggered fraud warning or fraud monitoring procedures within . . . American Express. Yet, in spite of significant evidence that [Trilegiant's] business practices did not meet the credit card systems' standards, [Trilegiant] maintained access to the credit card systems and processed millions of questionable credit and debit charges through these systems every month.

* * *

[B]ecause the credit card companies did not vigorously enforce their own rules, [Trilegiant] w[as] able to charge millions of consumers monthly fees that the consumers had not authorized.

88.     The credit card companies profit from Trilegiant transactions, earning a percentage of the fee Trilegiant charges.

### D. Trilegiant Enterprises, Marketing Partners, and Credit Card Companies Have Notice of Consumer Complaints Spawned by their Fraudulent Billion-Dollar Scheme.

89.     Thousands of consumers have complained, and are continuing to complaint about the practices described herein, claiming that they incurred unauthorized charges for Membership Clubs and experienced extreme difficulty in attempting to cancel these charges.  These complaints were made, and are being made, on public internet forums, and directly to the Trilegiant Enterprises and their affiliates, subsidiaries, and/or parent companies, credit card companies (including the credit card companies named as defendants herein), and e-merchants (including the Marketing Partners named as defendants herein).  Here are but a few examples of such complaints:

a.     "My banking institution informed me of an overdraft.  I am pretty good with my bank account never getting overdrawn.  My bank told me about 2 charges of $19.99; both from 2 different companies, but both called TLG . . . I

wish everyone who has been ripped off by these people would band together & file a lawsuit."

b.      "This company TLG or Trilegiant whatever.  They charged my card without my authorization.  I dont[sic] even know how they got my credit card information.  I dont[sic] even know what this company does.  They charged my card continuously and I dont[sic] even know what for?"

c.      "I discovered going through my debit card statement on Jun 23 2011 that there were several charges of $16.99 that I could not correlate with any purchases . . . it was discovered that the charges originated in February 2011. Each month had a charge on the 8th and 29th of the month—one TLGTVLADV(TLG Travel Advantage) and one for TLGSHOPPERADV (TLG Shopper Advantage).  Therefore at this point my account has been debited with a total of $169.90."

d.      "Trilegiant and Wells Fargo Bank . . . bill[ed] and collect[ed] unauthorized charges from me for products or memberships that I've never requested or consented to receive."

e.      "I have absolutely [n]o idea how these people got my credit card number, but they claim I signed up for a membership of $19.99 per month 8/20/10.  I never received membership information or anything . . ."

f.      "The first time I had ever heard of TLG Buyers Advantage, TLG Everyday or Trilegiant was when I bought a electronic equipment item for my computer over the phone.  The lady that helped me through the buying process wouldn't stop talking about how I could get forty dollars back if I paid one dollar for this "protection service."  I tried to deny the service several times by saying an outright NO.  Finally, feeling frustrated, I said fine and waited for my package that she said would contain information to cancel the service.  I called that number when things came in the mail and thought that was the end of it.  But, three months later, I noticed that 16.99 was coming out of my account for TLG Everyday, and another 16.99 for TLG Buyers Advantage.  When I noticed this I called Trilegiant and told them to cancel my service with them, and they were reluctant to cancel my service, however I got a cancellation number this time around.  It has been a month since that incident and now they are charging me yet again, but this time only for the TLG Everyday.  TRILEGIANT and all of its affiliates are SCAM ARTISTS."

g.      "On or about October 2009, I made a DVD purchase from an internet company called Miles Kimball.com for a DVD that was advertised on television.  On the pay page of that website, it steers you to other options which may be of interest.  Some unrelated questions are asked such as your town of birth?  You end up on a "confirmation" page to accept some type of discount service . . . I simply exited that website without confirming anything.  Apparently, I had signed up without my knowledge, to that discount program simply by means

of looking at what they had to offer! I called the Miles Kimball.com people again. The woman helping me . . . mentioned that their associate business []Trilegiant Corp. should be contacted "to see what they can do." [This consumer goes on to say that he called Trilegiant and was told by the representative that he signed up for the service] "by confirming [his] mother's maiden name and place of birth." [After he threatened to contact the Connecticut Attorney General's office, he was transferred to another person who told him he would be receiving a complete refund of the charges.]

  h.     "Shopping Essentials and TLG*Great Fun. I have had the experience of being double billed months (for approximately 10 months on our credit card for services we did *NOT* request or authorize). One monthly charge was for $11.95 and the second for $12.99."

  i.     "TLG HAS BEEN BILLING MY CREDIT CARD AND I DID NOT AUTHORIZE THIS CHARGE OF $11.99 A MONTH. I DO NOT GIVE MY CREDIT CARD NUMBER TO ANYONE ON THE INTERNET SO I AM UNABLE TO KNOW HOW THEY GOT MY INFORMATION."

  j.     "We discovered that TLG Great Fun had been charging our credit card $11.99 per month since April 09 when my wife ordered two pairs of shoes from FootSmart. We did not authorize TLG Great Fun nor give them our credit card number, so apparently FootSmart shared this information with TLG Great Fun. I contacted TLG Great Fun and asked for the $11.99 fraudulently billed, but have not received any indication that they will refund the money."

  k.     "Both companies tlg great fun and tlg travelers advantage began taking 12.50 each from my bank account in June 2009 and did so thru December 2009 without any authorization. My bank said they cound[sic] not stop them since they were taking it from a debit card number.

I finally cancelled my debit card and had it reissued with a new number which is the only way I could stop them. I tried calling them several times to get my money refunded without ever getting to talk to a person. Always put on hold for very long times."

  l.     "When I ordered some items on-line, Great Fun! got my personal information and charged my bank account even though I didn't authorize Great Fun! to charge me for any services or products. I had to call Great Fun! three times to have the unauthorized charges removed, and my information removed from their membership database."

  m.     "TLG Shoppers Advantage charged my credit card every month after I was assured that my trial membership had been cancelled . . . They mask themselves as professionals who can help promote businesses but they are actually rip-off scam artists that will lie to the consumer and then steal money by unauthorized charges after they bait you with discounted services with a 'free trial

membership.' The[y] will bait you with their 'free trial membership'—in order to get your credit card information. Then, after you cancel (within the 30 day free trial period), they will 'forget' to cancel your membership and continue to rip you off until you catch them . . . They've been reported countless times and yet keep finding ways to rip off more consumers."

n.      "TGL ripped off my 89 year old father by charging his credit card and not responding to pleas from my father to stop. My father has been charged for over a year on his credit card twice monthly by TGL. He tried to get them to stop but they continued to charge. I found out about it and am trying to file as many complaints as possible."

o.      "Elite Excursions is evidently part of Trilegiant (parent of such well-known ripoff companies as Travelers Advantage and Buyers Edge, both of which had previously ripped me off). On June 29 I was debited $12.99, which I noted in my check ledger . . . Then on July 29 I was debited another $12.99 . . . when I tried to go to Elite Excursions' website, I was told I was being redirected to Travelers Advantage . . . They already had my info because, as I mentioned above, Travelers Advantage has already stolen from me."

p.      "Trilegiant charged my Chase Credit card on 2 occasions for services that I never requested. I had never even heard of this company before now.

The first time I was charged for their TravelersAdvantage services. The second time I was charged for the HealthSaver services. I don't even know what these services are comprised of . . . This is a scam. I can see that others have also complained about this company. Trilegiant should be driven out of business and other businesses associated with this scam should be fined."

90.     Despite the flood of consumer complaints, the Trilegiant Enterprises continue to engage in the same fraudulent marketing scheme under their partnership agreements with numerous Marketing Partners.

91.     The Trilegiant Enterprises generated over $1.4 billion in revenue from Internet consumers who have been charged for Membership Programs, $792 million of which went to the various Marketing Partners.

## CLASS ACTION ALLEGATIONS

92.     Plaintiffs bring this action on behalf of themselves and as a class action,

pursuant to the provisions of Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil

Procedure on behalf of a class defined as follows:

### Plaintiff Class

All persons in the United States who, while completing online sales
transactions with one or more of the parties named herein as Marketing
Partner Defendants, incurred charges for one or more of the Membership
Programs during the period from March 2008 through the present day (the
"Plaintiff Class").

Excluded from the Plaintiff Class are Defendants and their subsidiaries and affiliates; all

persons who make a timely election to be excluded from the Plaintiff Class;

governmental entities; and the judge to whom this case is assigned, including any

immediate family members thereof.  Plaintiffs reserve the right to modify or amend the

Plaintiff Class definition, as appropriate.

93.     Certification of Plaintiffs' claims for classwide treatment is appropriate

because Plaintiffs can prove the elements of their claims on a classwide basis using the

same evidence as would be used to prove those elements in individual actions alleging

the same claims.

94.     **Numerosity – FED. R. CIV. P. 23(a)(1).**  The members of the Plaintiff Class

are so numerous that individual joinder of all Plaintiff Class members is impracticable.

There are at least thousands, if not tens of thousands, of consumers who have incurred

fraudulent and unauthorized charges for the Membership Programs described herein.

The precise number of Plaintiff Class members and their addresses is unknown to

Plaintiffs, but may be ascertained from Defendants' books and records.  Plaintiff Class

members may be notified of the pendency of this action by recognized, Court-approved

notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

95.    **Commonality and Predominance – FED. R. CIV. P. 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Plaintiff Class members. All Plaintiff Class members were the targets of, and were victimized by, the same fraudulent and deceptive practices on the part of Defendants, and there are no significant individual issues which would become the focus of this action. Furthermore, common questions of law and fact, include, but are not limited to, the following:

      a.    whether Defendants caused Plaintiffs and Plaintiff Class members to incur unauthorized charges on their credit and/or debit card accounts for Membership Programs;

      b.    whether Defendants' conduct in causing these unauthorized charges constitutes wire fraud pursuant to 18 U.S.C. § 1343;

      c.    whether Defendants' conduct in causing these unauthorized charges constitutes mail fraud pursuant to 18 U.S.C. § 1341;

      d.    whether Defendants' conduct in causing these unauthorized charges constitutes bank fraud pursuant to 18 U.S.C. § 1344(2);

      e.    whether the conduct alleged and the allegations herein with respect to that conduct satisfy the enterprise, pattern, and other elements of racketeering activity under RICO;

f.      whether Plaintiffs' and Plaintiff Class members' credit and/or debit card account information and other private information was wrongfully accessed by persons or entities not authorized to access such information;

g.      whether the transmission of Plaintiffs' and Plaintiff Class members' credit and/or debit card account information and other private information between and among Trilegiant, its affiliates, subsidiaries, and/or parent companies, and E-merchants in connection with consumers' internet transactions violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.*;

h.      whether Defendants' conduct as alleged herein was in violation of the Connecticut Unfair Trade practices Act, C.G.S. § 42-110a, *et seq.*; and

i.      whether Plaintiffs and the other members of the Plaintiff Class are entitled to equitable relief, including but not limited to injunctive relief and restitution.

96.     **Typicality – FED. R. CIV. P. 23(a)(3).**  Plaintiffs' claims are typical of the claims of the other members of the Plaintiff Class because, among other things, all Plaintiff Class members were comparably injured through the uniform misconduct described above, and were subject to Defendants' scheme to enroll consumers in the Membership Programs and cause them to incur unauthorized charges on their credit and/or debit card accounts.

97.     **Adequacy of Representation – FED. R. CIV. P. 23(a)(4).**  Plaintiffs are adequate Plaintiff Class representatives because their interests do not conflict with the interests of the other members of the Plaintiff Class they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and

Plaintiffs' intend to prosecute this action vigorously.  The Plaintiff Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

98.    **Declaratory and Injunctive Relief – FED. R. CIV. P. 23(b)(2).**  Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Plaintiff Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to members of the Plaintiff Class as a whole.

99.    **Superiority – FED. R. CIV. P. 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other members of the Plaintiff Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Plaintiff Class members to individually seek redress for Defendants' wrongful conduct.  Even if the Plaintiff Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contract, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy scale, and comprehensive supervision by a single court.

100.    This action is also brought as a class action, pursuant to the provisions of Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, proposing certification of a class of Defendants defined as follows:

**Defendant Class**

The named Marketing Partners, as well as all online merchants, e-commerce companies, e-merchants, and other unnamed co-conspirators, who own, or operate an online forum or web site who have facilitated or allowed one or more of the Trilegiant Enterprises, through such online forums, web sites, or otherwise, to charge consumers' credit or debit card accounts after completing an online purchase.

Plaintiffs reserve the right to modify or amend the Defendant Class definition, as appropriate.

101.    Certification of the Defendant Class is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

102.    **Numerosity – FED. R. CIV. P. 23(a)(1).**  The members of the Defendant Class are so numerous that individual joinder of all Defendant Class members is impracticable.  There are hundreds of defendants who operate online forums or web sites similar to the Marketing Partners named herein, and have caused consumers to incur fraudulent and unauthorized charges for the Membership Programs described herein.  The precise number of Defendant Class members and their addresses is unknown to Plaintiffs, but may be ascertained from information and records in the possession or control of the Trilegiant Enterprises.  Defendant Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

103.    **Commonality and Predominance – FED. R. CIV. P. 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Defendant Class members.  All Defendant Class members

operated online forums and/or web sites for e-commerce purposes, and participated in the same fraudulent and deceptive practices on the part of Defendants, including the Marketing Partners named herein, and there are no significant individual issues which would become the focus of this action.  Furthermore, common questions of law and fact, include, but are not limited to, the following:

   a. whether Marketing Partners and Defendant Class members caused Plaintiffs and Plaintiff Class members to incur unauthorized charges on their credit and/or debit card accounts for Membership Programs;

   b. whether Marketing Partners' and Defendant Class members' conduct in causing these unauthorized charges constitutes wire fraud pursuant to 18 U.S.C. § 1343;

   c. whether Marketing Partners' and Defendant Class members' conduct in causing these unauthorized charges constitutes mail fraud pursuant to 18 U.S.C. § 1341;

   d. whether Marketing Partners' and Defendant Class members' conduct in causing these unauthorized charges constitutes bank fraud pursuant to 18 U.S.C. § 1344(2);

   e. whether the conduct alleged and the allegations herein with respect to that conduct satisfy the enterprise, pattern, and other elements of racketeering activity under RICO;

   f. whether Marketing Partners and Defendant Class members caused Plaintiffs' and Plaintiff Class members' credit and/or debit card account

information and other private information to be wrongfully accessed by persons or entities not authorized to access such information;

g.      whether Marketing Partners and Defendant Class members caused and/or facilitated the transmission of Plaintiffs' and Plaintiff Class members' credit and/or debit card account information and other private information between and among Trilegiant, its affiliates, subsidiaries, and/or parent companies, E-merchants, and Defendant Class in connection with consumers' internet transactions violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.*;

h.      whether Marketing Partners' and Defendant Class members' conduct as alleged herein was in violation of the Connecticut Unfair Trade practices Act, C.G.S. § 42-110a, *et seq.*; and

i.      whether Marketing Partners and members of Defendant Class members are entitled to assert any defenses to such violations.

104.    **Typicality – FED. R. CIV. P. 23(a)(3).**  The claims against the Marketing Partners are typical of the claims of the other Defendant Class members because, among other things, all Defendant Class members operate under the same agreement with one or more of the Trilegiant Enterprises and/or Credit Card Companies alleged to cause the uniform misconduct described above and participated in the scheme to enroll consumers in the Membership Programs causing Plaintiffs and members of the Plaintiff Class to incur unauthorized charged on their credit and/or debit card accounts.

105. **Adequacy of Representation – FED. R. CIV. P. 23(a)(4).** The named Marketing Partners are adequate Defendant Class representatives because their interests do not conflict with the interests of the other Defendant Class members.

106. **Declaratory and Injunctive Relief – FED. R. CIV. P. 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Plaintiff Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Plaintiff Class as a whole. Certification of a Defendant Class is appropriate because Plaintiffs and the Plaintiff Class are seeking such injunctive relief and declaratory relief with respect to all members of the Defendant Class, whether specifically named herein or acting as an unnamed co-conspirator.

107. **Superiority – FED. R. CIV. P. 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Certifying a Defendant Class will avoid potentially inconsistent or contradictory judgments, and reduce the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy scale, and comprehensive supervision by a single court.

<u>**COUNT I**</u>
**Violations of Racketeer Influenced Corrupt Organizations Act**
**18 U.S.C. § 1962(c)**
**Against All Defendants**

108.    The preceding paragraphs of this Complaint are realleged and incorporated by reference. This claim, which asserts violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against all Defendants.

**The RICO Enterprise**

109.    At all relevant times, Defendants, and each of them, unlawfully, knowingly and intentionally conducted and participated, directly and/or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity as set forth below, in violation of Section 1962(c) of RICO, 18 U.S.C. § 1962(c).

110.    Trilegiant, together with the Marketing Partners and the Credit Card Companies, formed an association-in-fact for the common purpose of unlawfully, fraudulently, and deceptively marketing and selling Defendants' Membership Programs to consumers, including Plaintiffs and Plaintiff Class members. In order to carry out their common purpose, Defendants established, directed, and/or participated in the operation and management of an ongoing, independent structure and mechanism for extracting from consumers unauthorized "membership fees" related to Defendants' Membership Programs. Said structure worked, and continues to work, as follows: In exchange for valuable compensation, Defendants are provided with consumers' personal identifying and financial information by the Marketing Partners, without consumers' authorization or consent. Defendants, in turn, use this information to enroll consumers in their Membership Programs, again without consumers' authorization or consent, and then charge them substantial unauthorized "membership fees," ranging between $8.99 per month and $480.00 annually. At all times, Defendants knew and intended to defraud consumers of "membership fees" by means of this independent structure, thereby

maximizing their respective profits in the process. This association-in-fact constitutes an "enterprise" within the meaning of Section 1961(4) of RICO, 18 U.S.C. § 1961(4).

111. At all relevant times, Defendants, and each of them, were "person(s)," as that term is defined in Section 1961(3) of RICO, 18 U.S.C. § 1961(3), and are legally distinct from the enterprise.

112. At all relevant times, the enterprise as described herein was engaged in, and its activities affected, interstate commerce within the meaning of Section 1962( c) of RICO, 18 U.S.C. § 1962(c).

### Racketeering Activity and Predicate Acts

113. Defendants, and each of them, engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in acts that constitute a violation of the following statutes: 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1341 (mail fraud).

114. Defendants, and each of them, , did willfully and with the purpose to defraud consumers, including Plaintiffs, and to obtain consumers' money or property by means of false pretenses, engage in fraudulent conduct constituting wire and mail fraud, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1341, by engaging in the following acts:

a. Forming and maintaining the RICO enterprise;

b. Fraudulently concealing from consumers that they have been unilaterally enrolled in Defendants' Membership Programs without their authorization or consent;

c. Fraudulently concealing from consumers that they have been, and will continue to be, charged for their membership in Defendants' Membership Programs;

d.    Fraudulently concealing from consumers the fact of, or amount of, the recurring charges they will incur by virtue of their enrollment in Defendants' Membership Programs;

e.    Fraudulently concealing from consumers the terms and conditions relating to Defendants' Membership Programs;

f.    Fraudulently concealing from consumers the benefits (if any), obligations, features, components, or elements of Defendants' Membership Programs;

g.    Fraudulently concealing from consumers the manner of accessing and/or using Defendants' Membership Programs; and

h.    Fraudulently concealing from consumers that Plaintiffs and Plaintiff Class members' credit, debit, or charge cards and other personal, private, and confidential information is transferred by e-commerce merchants to Defendants for the purpose of systematically and unilaterally charging Plaintiffs and the Plaintiff Class for enrollment in Defendants' Membership Programs.

115.    By virtue of the foregoing fraudulent activities, Defendants have engaged in a pervasive pattern of unlawful and unfair business practices, causing harm to Plaintiffs and the members of the Plaintiff Class. Defendants' fraudulent conduct, as described above, constitutes a scheme or artifice to defraud Plaintiffs and Plaintiff Class members.

116.    In furtherance of and for purposes of executing the foregoing fraudulent and illegal course of conduct and scheme to defraud, Defendants used, and caused to be used, interstate wire and mail communications to transmit or disseminate false,

fraudulent, and misleading communications and information, in violation of the wire and mail fraud statutes, 18 U.S.C. §§ 1343 and 1341. Defendants' use of interstate wire facilities includes text and images relating to Defendants' Membership Programs which appear on the Marketing Partners' websites, including, inter alia, (1) "interstitial sales" offer pages appearing between the checkout page and the confirmation page of the e-commerce merchant from whom the consumer intends to make a purchase, (2) "pop up" windows appearing on top of the confirmation page, and (3) hyperlinks or "banners" that are included directly on the confirmation page itself. Defendants' use of interstate mail facilities includes, inter alia, the mailing of checks and other modest premiums to consumers which Defendants represent to be "rewards" for being valued customers.

117.   All of the interstate wire and mail communications were made in furtherance of Defendants' scheme to defraud Plaintiffs and Plaintiff Class members and to obtain their money or property by means of false pretenses.

118.   Each interstate wire and mail communication that was made in furtherance of Defendants' scheme to defraud Plaintiffs and Plaintiff Class members and to obtain their money or property by means of false pretenses, constitutes a separate and distinct act of "racketeering activity," as that term is defined in Section 1961(1) of RICO, 18 U.S.C. § 1961(1).

119.   Defendants each committed and/or abetted the commission of significantly more than two of these acts of "racketeering activity."

120.   The predicate acts are common to Defendants' scheme to conduct the affairs of the RICO enterprise, and the acts are continuing and threatening to continue

indefinitely.  These predicate acts are chargeable and indictable, as required under Section 1961(1) of RICO, 18 U.S.C. § 1961(1).

121.    The racketeering activity was and is related by virtue of common participants, common victims (Plaintiffs and Plaintiff Class members), a common structure and method of commission, a common purpose, and a common result of enrolling and charging consumers for unknown and unwanted Membership Programs, thereby defrauding Plaintiffs and Plaintiff Class members of significant monies and unjustly enriching Defendants and their collaborators.

122.    The racketeering activity is distinct from the RICO enterprise. The enterprise, as an association-in-fact, was formed to facilitate the marketing and sale of Defendants' Membership Programs. The racketeering activity- Defendants' and their collaborators' practice of unlawfully, fraudulently, and deceptively collecting unauthorized "membership fees" from consumers through repeated acts of wire and mail fraud - enables Defendants and their collaborators to profitably maintain and conduct the enterprise for the purpose of defrauding consumers.

### Causation

123.    As a direct and proximate result of the racketeering activity, Plaintiffs and Plaintiff Class members were enrolled in and charged for Membership Programs, on an ongoing basis, at the cost of between $8.99 per month and $480.00 annually, plus any fees charged by financial institutions when Defendants' activities resulted in the consumer's account being overdrawn. Thus, Plaintiffs and Plaintiff Class members have been injured in their business or property and, therefore, have standing to sue

44

Defendants and recover damages and costs of bringing this class action under Section 1964(c) of RICO, 18 U.S.C. § 1962(c).

124.    By virtue of their violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), Defendants, and each of them, are jointly and severally liable to Plaintiffs and Plaintiff Class members for three times the damages that Plaintiffs and Plaintiff Class members suffered as a result of Defendants' scheme to defraud consumers.

**COUNT II**
**Violations of Racketeer Influenced Corrupt Organizations Act**
**18 U.S.C. § 1962(d)**
**Against All Defendants**

125.    The preceding paragraphs of this Complaint are realleged and incorporated by reference. This claim, which asserts violations of Section 1962(d) of RICO, 18 U.S.C. § 1962(d), is asserted against all Defendants.

126.    Defendants willfully combined, conspired and agreed to conduct and participate, directly and/or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), thereby violating Section 1962(d) of RICO, 18 U.S.C. § 1962(d). This racketeering activity consisted of repeated violations of the federal wire fraud, mail fraud and bank fraud statutes.

127.    Defendants knew of, agreed to, and acted in furtherance of the overall objective of the conspiracy by, inter alia, entering into marketing and sales agreements that created the structure, mechanism, and financial incentive for defrauding consumers of "membership fees" relating to Defendants' Membership Programs.

128.    As a direct and proximate result of the conspiracy to commit the predicate acts of wire and mail fraud in violation of 18 U.S.C. § 1962(d) as detailed above,

Plaintiffs and Plaintiff Class members were enrolled in and charged for Membership Programs, on ongoing basis, at the cost of between $8.99 per month and $480.00 annually, plus any fees charged by financial institutions when Defendants' activities resulted in the consumer's account being overdrawn. Thus, Plaintiffs and Plaintiff Class members have been injured in their business or property and, therefore, have standing to sue Defendants and recover damages and costs of bringing this class action under Section 1964(d) of RICO, 18 U.S.C. § 1962(d).

129.    By virtue of their violations of Section 1962(d) of RICO, 18 U.S.C. § 1962(d), Defendants, and each of them, are jointly and severally liable to Plaintiffs and Plaintiff Class members for three times the damages that Plaintiffs and Plaintiff Class members suffered as a result of Defendants' conspiracy to defraud consumers.

**COUNT III**
**Aiding and Abetting Violations of RICO**
**18 U.S.C. §§ 1961-1968**
**Against Defendant Credit Card Companies**

130.    Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

131.    This Count III is brought by Plaintiffs on behalf of themselves and the Plaintiff Class against Defendant Credit Card Companies.

132.    Defendant Credit Card Companies aided and abetted Trilegiant Enterprises and its Marketing Partners in violating, and conspiring to violate, RICO, 18 U.S.C. §§ 1961-1968.

133.    Without Defendant Credit Card Companies' continued cooperation by continually processing the recurring the Trilegiant Enterprises credit card charges, the Trilegiant Enterprises and their Marketing Partners could not accomplish the fraudulent

marketing scheme to enroll consumers in Membership Programs without their knowledge or consent.

134.    Defendant Credit Card Companies aided and abetted the Trilegiant Enterprises and their Marketing Partners in their repeated commission of mail, wire, and bank frauds with full knowledge that the consumers never provided their confidential billing information directly to the Trilegiant Enterprises, and never provided informed consent to the Trilegiant Enterprises to charge a monthly fee on their credit cards.

**COUNT IV**
**Aiding and Abetting Commissions of Mail Fraud 18 U.S.C. § 1341,**
**Wire Fraud, 18 U.S.C. § 1343, and Bank Fraud, 18 U.S.C. § 1344**
**Against Defendant Credit Card Companies**

135.    Plaintiffs incorporate by reference all allegations of all prior paragraphs as though fully set forth herein.

136.    This Count IV is brought by Plaintiffs on behalf of themselves and the Plaintiff Class against Defendant Credit Card Companies.

137.    Defendant Credit Card Companies aided and abetted the Trilegiant Enterprises and their Marketing Partners in violating, and conspiring to violate, 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1344 (bank fraud).

138.    Without Defendant Credit Card Companies' continued cooperation by continually processing the recurring the Trilegiant Enterprises credit card charges, the Trilegiant Enterprises and its Marketing Partners could not accomplish the fraudulent marketing scheme to enroll consumers in membership programs without their knowledge or consent.

139.   Defendant Credit Card Companies aided and abetted the Trilegiant Enterprises and its Marketing Partners in their repeated commission of mail, wire, and bank frauds with full knowledge that the consumers never provided their confidential billing information directly to the Trilegiant Enterprises, and never provided informed consent to the Trilegiant Enterprises to charge a monthly fee on their credit cards.

### COUNT V
### Violations of Electronic Communications Privacy Act
### 18 U.S.C. §§ 2510 *et seq.*
### Against Trilgiant Enterprises and Marketing Partners Defendants

140.   Plaintiffs incorporate by reference all allegations of all prior paragraphs as though fully set forth herein.

141.   This Count V is brought by Plaintiffs on behalf of themselves and the Plaintiff Class against the Trilegiant Enterprises and Marketing Partners.

142.   The ECPA prohibits any person from "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2510(1)(a).

143.   "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

144.   "Intercept" means the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

145.   The transmission over the Internet of the confidential credit or debit card account information to various e-merchants, including the Marketing Partners, by

Plaintiffs and Plaintiff Class members constitutes "electronic communications" within the meaning of 18 U.S.C. § 2510(12). The transmission is a private communication among these e-merchants and Plaintiffs and Plaintiff Class members, made for the sole purpose of purchasing the e-merchants' products and/or services that did not include the The Trilegiant Enterprises' Membership Programs.

146.    Without prior notice to Plaintiffs and Plaintiff Class members and in furtherance of their fraudulent marketing scheme to enroll and charge unwitting consumers for the Membership Programs as alleged in this Complaint, Trilegiant Enterprises entered into partnership agreements with various e-merchants, including the Marketing Partners, to intentionally intercept, and did intercept, Plaintiffs' and Plaintiff Class members' confidential credit card information by means of electronic devices, including, but not limited to, their computers, in violation of 18 U.S.C. § 2510(l)(a).

147.    Pursuant to 18 U.S.C. § 2520, Plaintiffs and the Plaintiff Class members are entitled to preliminary, equitable and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 per day for each day of violation, actual and punitive damages, reasonable attorneys' fees and other litigation costs, and Defendants' profits obtained from the above- described violations.

### COUNT VI
**Aiding and Abetting Violations of Electronic Communications Privacy Act
18 U.S.C. §§ 2510 *et seq.*
Against Defendant Credit Card Companies**

148.    Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

149.   This Count VI is brought by Plaintiffs on behalf of themselves and the Plaintiff Class against Defendant Credit Card Companies.

150.   Defendant Credit Card Companies aided and abetted the Trilegiant Enterprises and its Marketing Partners in violating, and conspiring to violate, the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, et seq.

151.   Without Defendant Credit Card Companies' continued cooperation by continually processing the recurring the Trilegiant Enterprises credit card charges, the Trilegiant Enterprises and their Marketing Partners could not accomplish the fraudulent marketing scheme to enroll consumers in Membership Programs without their knowledge or consent.

152.   Defendant Credit Card Companies aided and abetted the Trilegiant Enterprises and their Marketing Partners in their intentional interception of Plaintiffs and Plaintiff Class members' confidential credit card information by means of electronic devices, including, but not limited to, their computers, with full knowledge that the consumers never provided their confidential billing information directly to the Trilegiant Enterprises, and never provided informed consent to the Trilegiant Enterprises to charge a monthly fee on their credit cards.

## COUNT VII

**Violation of Connecticut Unfair Trade Practices Act**
**C.G.S. § 42-110a, et seq.**
**Against Trilegiant Enterprises And Marketing Partners Defendants**

153.   Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

154.   This Count VII is brought by Plaintiffs on behalf of themselves and the Plaintiff Class against the Trilegiant Enterprises and the Marketing Partners.

155.   At all times relevant hereto, Plaintiffs and Plaintiff Class members were "persons" within the meaning of CUTPA (C.G.S. § 42-110a, et seq.).

156.   The Defendants are engaged in trade or commerce within the meaning of Connecticut General Statute § 42-110a.

157.   Defendants' marketing and sale of the Membership Programs as described herein is an unfair and deceptive act and practice in violation of C.G.S. § 42-110b(a), including, *inter alia*:

a.   Representing the Membership Programs as part of the overall transaction with the e-merchants, including the Marketing Partners, when in fact they are separate financial transactions with the Trilegiant Enterprises;

b.   Failing to disclose that Trilegiant automatically charges monthly assessments to Plaintiffs' and Plaintiff Class members' credit cards, except in an exceedingly fine print that virtually no one reads;

c.   Failing to disclose that the e-merchants affiliated with Trilegiant Enterprise, including the Marketing Partners, have a strong financial incentive to share, without proper consent, Plaintiffs' and Plaintiff Class members' credit card information with the Trilegiant Enterprises, and that these e-merchants do share the credit card information with the Trilegiant Enterprises pursuant to a partnership agreement; and

d.   Repeatedly processing fraudulent, unauthorized charges on Plaintiffs' and Plaintiff Class members' credit or debit cards with knowledge that these charges are in clear violation of the credit card companies' merchant rules.

158.   As a result of Defendants' fraudulent and unfair business practices, Plaintiffs and other Plaintiff Class members have suffered ascertainable losses within the meaning of C.G.S. § 42-110g(a) and have been damaged by Defendants' unlawful acts.

159.   Defendants' fraudulent and deceptive acts and practices present an ongoing threat and likelihood of deception to members of the public and constitute a fraud upon the members of the public, as well as unfair, unlawful and deceptive acts, in violation of CUTPA.

160.   Defendants' conduct as alleged in this cause of action constitutes intentional and wanton violation of Plaintiffs' rights and the rights of the members of the Class, or was done with a reckless indifference to those rights.

161.   Defendants engaged in the unfair or deceptive acts or practices described herein with intent that others rely upon their concealment, suppression and/or omission of material facts.

162.   As a direct and proximate result of the foregoing acts and/or omissions of Defendants, Plaintiffs and Plaintiff Class members were damaged in an amount to be determined at trial.

**COUNT VIII**
**Aiding and Abetting Violation of Connecticut Unfair Trade Practices Act**
**C.G.S. § 42- 110a, et seq.**
**Against Defendant Credit Card Companies**

163.   Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

164.   This Count VIII is brought by Plaintiffs on behalf of themselves and the Plaintiff Class against Defendant Credit Card Companies.

165.    Defendant Credit Card Companies aided and abetted Trilegiant and the Marketing Partners in violating, and conspiring to violate, the Connecticut Unfair Trade Practices Act, C.G.S. § 42-110a, et seq.

166.    Without Defendant Credit Card Companies' continued cooperation by continually processing the recurring the Trilegiant Enterprises credit card charges, the Trilegiant Enterprises and its Marketing  Partners could not accomplish the fraudulent marketing scheme to enroll consumers in Membership Programs without their knowledge or consent.

167.    Defendant Credit Card Companies aided and abetted the Trilegiant Enterprises and their e-merchant partners, including the Marketing Partners, to commit unfair and deceptive acts as described in this Complaint with full knowledge that the consumers never provided their confidential billing information directly to the Trilegiant Enterprises, and never provided informed consent to the Trilegiant Enterprises to charge a monthly fee on their credit cards.

## COUNT IX
### Violation of California Business and Professional Code §§ 17602
### Against Trilegiant Enterprises and Marketing Partners Defendants

168.    Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

169.    This Count IX is brought by Plaintiffs on behalf of themselves and the Plaintiff Class against all Trilegiant Enterprises and Marketing Partners Defendants.

170.    At all times relevant hereto, Plaintiffs and Plaintiff Class members were "consumer[s]" within the meaning of Cal. Bus. & Prof. Code § 17601.

171.   Defendants' marketing and sale of the Membership Programs as described herein constituted a violation of Cal. Bus. & Prof. Code § 17602, because Defendants:

a.   Failed to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled;

b.   Charged the consumer's credit or debit card or the consumer's account with a third party for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms;

c.   Failed to provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer.

172.   As a direct and proximate result of the foregoing acts and/or omissions of Defendants, Plaintiffs and Plaintiff Class members were damaged in an amount to be determined at trial.

## COUNT X
### Unjust Enrichment
### Against All Defendants

173.   Plaintiffs incorporate by reference the allegations of all prior paragraphs as though fully set forth herein.

174.   This Count X is brought by Plaintiffs on behalf of themselves and the Plaintiff Class against all Defendants.

175.   As a result of Defendants' fraudulent, deceptive, and unlawful conduct, Plaintiffs and Plaintiff Class members have conferred benefits upon Defendants in the form of recurring, monthly payment for Defendants' Membership Programs.

176.   Defendants were at all times aware that the benefits conferred upon by them by Plaintiffs and Plaintiff Class members were the result of Defendants' fraudulent, deceptive, and wrongful conduct.

177.   Allowing Defendants to retain these unjust profits and other benefits would offend traditional notice of justice and fair play. Under these circumstances, it would be inequitable for Defendants to retain the benefits and allowing them to do so would induce companies to fraudulently conceal, mislead, and/or misrepresent key characteristics and obligations of their products in order to increase sales and profit.

178.   Plaintiffs, on behalf of themselves and all others similarly situated, seek restitution from Defendants and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment as follows:

A.      For an order certifying this action as a class action on behalf of the Plaintiff Class and the Defendant Class described above, appointing Plaintiffs as the representatives of the Plaintiff Class, appointing Marketing Partners as the representatives of the Defendant Class, and designating Plaintiffs' counsel as counsel for the Plaintiff Class;

B.      For restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiffs and members of the Plaintiff Class;

C.      For damages according to proof;

D.      For an award of treble damages where permitted under applicable law;

E.      For an award of punitive damages where permitted under applicable law;

F.      For preliminary and permanent injunctive relief, including an injunction prohibiting Defendants from any further engagement in the fraudulent marketing scheme to enroll consumers into their Membership Programs and charge a monthly fee without authorization;

G.      For an award of attorneys' fees as appropriate pursuant to the above cited statutes;

H.      For costs of suit herein incurred;

I.      For both pre- and post-judgment interest on any amounts awarded; and

J.      For such other and further relief as the Court may deem proper.


Respectfully submitted,

THE PLAINTIFFS

BY: _____
David A. Slossberg, Esq.  CT13116
Andrew W. Skolnick, Esq. CT13422
HURWITZ SAGARIN SLOSSBERG & KNUFF, LLC
147 North Broad Street
Milford, Connecticut 06460
(203) 877-8000 (telephone)
(203) 878-9800 (facsimile)
dslossberg@hssklaw.com
askolnick@hssklaw.com

David Pastor, Esq.
PASTOR LAW OFFICE, LLP
63 Atlantic Avenue, Third Floor
Boston, Massachusetts 02110
(617) 742-9700 (telephone)
(617) 742-9701 (facsimile)
dpastor@gilmanpastor.com


Kenneth G. Gilman, Esq.
GILMAN LAW LLP
Beachway Professional Center Tower
3301 Bonita Beach Road, Suite 307
Bonita Springs, Florida 34134
(239) 221-8301 (telephone)
(239) 676-8224 (facsimile)
kgilman@gilmanpastor.com

*Attorneys for Plaintiffs and Proposed Plaintiff Class*