UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| : | |
| : | CIVIL ACTION NO. |
| : | 3:12-CV-00396 (VLB) |
| In re Trilegiant Corporation, Inc.    : | |
| : | |
| : | |
| : | March 28, 2014 |

**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT OR, IN THE ALTERNATIVE, TO STRIKE PORTIONS OF THE COMPLAINT [DKT. 189]**

I.    <u>Introduction</u>

The Plaintiffs, Debra Miller ("Miller"), Brittany DiCarolis ("DiCarolis"), Hope Kelm ("Kelm"), Jennie H. Pham ("Pham"), Brett Reilly ("Reilly"), Juan M. Restrepo ("Restrepo"), Brian Schnabel, Edward Schnabel, Lucy Schnabel, Annette Sumlin ("Sumlin"), Regina Warfel ("Warfel"), and Debbie Williams ("Williams"), bring this proposed class action against three groups of Defendants, the Trilegiant Defendants, which includes Affinion Group, LLC ("Affinion"), Trilegiant Corporation, Inc. ("Trilegiant"), and Apollo Global Management, LLC ("Apollo"), the Credit Card Defendants, which includes Bank of America, N.A. ("Bank of America"), Capital One Financial Corporation ("Capital One"), Chase Bank USA, N.A. ("Chase"), Citibank, N.A. ("Citibank"), Citigroup, Inc. ("Citigroup"), Chase Paymentech Solutions, LLC ("Paymentech"), and Wells Fargo Bank, N.A. ("Wells Fargo"), and the E-Merchant Defendants, which includes 1-800-Flowers.com, Inc. ("1-800 Flowers"), Beckett Media LLC ("Beckett"), Buy.com, Inc. ("Buy.com"),

1

Classmates International, Inc. ("Classmates"), Days Inns WorldWide, Inc. ("Days Inns"), Wyndham WorldWide Corporation ("Wyndham"), FTD Group, Inc. ("FTD"), Hotwire, Inc. ("Hotwire"), IAC/InterActiveCorp ("IAC"), Shoebuy.com, Inc. ("Shoebuy"), PeopleFindersPro, Inc. ("PeopleFinder"), Priceline.com, Inc. "Priceline"), and United Online, Inc. ("United Online").

The Plaintiffs allege several causes of action against the Defendants, including violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c) (RICO), against all Defendants; conspiring to violate RICO, 18 U.S.C. § 1962(d), against all Defendants; aiding and abetting RICO, 18 U.S.C. §§ 1961-1968, against the Credit Card Defendants; aiding and abetting commissions of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and bank fraud, 18 U.S.C. § 1344, against the Credit Card Defendants; violations of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* (ECPA), against Trilegiant, Affinion, and the E-Merchant Defendants; aiding and abetting ECPA violations under 18 U.S.C. §§ 2510, *et seq.*, against the Credit Card Defendants; violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.* (CUTPA), against the Trilegiant Defendants and E-Merchant Defendants; aiding and abetting and conspiracy to violate CUTPA, Conn. Gen. Stat. § 42-110a, *et seq.*, against the Credit Card Defendants; violations of the California Business and Professional Code § 17602 (Automatic Renewal Statute), against the Trilegiant Defendants and E-Merchant Defendants; and claims of unjust enrichment against all Defendants.

Before the Court is the Defendants' Consolidated Motion to Dismiss or, in the Alternative, to Strike Various Portions of the Complaint.  [Dkt. 189].  Several of the Defendants have also filed separate motions to dismiss, strike, or stay the proceedings on various other grounds.  Those motions will be decided in other subsequent orders.  For the reasons that follow, Defendants' motion to dismiss or in the alternative to strike is GRANTED in part and DENIED in part as set forth herein.

## II.    Factual Background

The following facts and allegations are taken from the Plaintiffs' Consolidated Amended Class Action Complaint (the "Complaint").  [Dkt. 141, hereinafter "CAC at ¶"].  The Plaintiffs allege that through the Defendants' deceptive, unfair, and fraudulent business practices, the Plaintiffs were enrolled in Trilegiant membership programs without their knowledge or explicit consent and that their program memberships remained extant for months and in some cases years.  CAC at ¶ 1.  The alleged scheme was initiated and orchestrated by Trilegiant with the help of its parent companies, Apollo and Affinion, but was only successful because of a series of *quid pro quo* agreements executed with several of the E-Merchant Defendants and the willing participation of the Credit Card Defendants.  CAC at ¶ 3.

The Complaint asserts that Trilegiant sold memberships in its discount membership clubs, which the Plaintiffs conclude have "no real value."  CAC at ¶ 4.  Trilegiant marketed its memberships in collaboration with and to the

3

customers of various E-Merchant Defendants.  CAC at ¶ 72.  The E-Merchant Defendants received signing bonuses and/or substantial "bounties," equal to a percentage of "every dollar" Trilegiant earned from the E-Merchant customers that purchased Trilegiant products and services.  CAC at ¶¶ 6, 7.  The Plaintiffs also allege that several of the Credit Card Defendants formed partnerships with Trilegiant to allow Trilegiant to advertise and sell "credit guard type" programs to their customers, and others had marketing contracts requiring the Credit Card Defendants to send Trilegiant's hard copy mail advertisements to its customers with the customer's credit card or bank account statements.  CAC at ¶¶ 11(b), 49.  The Complaint does not allege, and the Court does not construe it to allege, that the Credit Card Defendants are included as E-Merchants.

The Plaintiffs further allege that the written agreements with the E-Merchant Defendants detailed at least four of the insidious business practices that were used to further the scheme's illegitimate ends.[1]  CAC at ¶ 7.  First, the Plaintiffs allege that Trilegiant and the E-Merchant Defendants engaged in post-transaction marketing by creating "a false and deceptive appearance," implying "that [Trilegiant's] offers for discount Membership Programs [were] part of the consumers' original transactions with the e-merchants." CAC at ¶ 74.  The Plaintiffs also allege that the E-Merchant Defendants had review authority over these designs and have final approval of any advertisement language.  CAC at ¶ 117.  To induce the feeling that the membership offer was from the E-Merchant Defendant, and not Trilegiant, the Plaintiffs allege that Defendants used three

---

[1] The Plaintiffs do not make similar allegations for the agreements between Trilegiant and the Credit Card Defendants.

different design tactics: (1) "'interstitial' sales offer pages" for Trilegiant's products, which appear between the checkout page and the confirmation page for the customer's primary, e-merchant purchase; (2) "'pop up' windows, detailing the offers, which appear on top of the e-merchant's confirmation page; and (3) a hyperlink to an enrollment offer (or 'banners') that are included on the [E]-[M]erchant Defendant's confirmation page."  CAC at ¶ 74.  Importantly, all of these marketing tactics were used before the customer received confirmation of its purchase with the E-Merchant Defendant.  CAC at ¶¶ 7(a), 117.

Second, the Plaintiffs allege that the E-Merchant Defendants engaged in "datapass" with Trilegiant, meaning that each individual E-Merchant Defendant passed its customers' confidential billing information to Trilegiant without the customers' explicit consent or knowledge; according to the Plaintiffs, this process is meant to facilitate further online purchases because the customers are not required to reenter their credit card or debit account information to complete a secondary transaction with Trilegiant.  CAC at ¶¶ 7(a), 75-80.  While it is unclear from the pleadings how and when this process exactly occurs, the Plaintiffs allege that there is an interface token that stores each customer's confidential billing information entered while making the primary purchase on the E-Merchant's website.  CAC at ¶ 117(c).  When the customer clicks on a link, a banner, or a pop-up window that leads to Trilegiant's disguised offer page, the token transfers the customer's confidential billing information directly to Trilegiant, presumably before the customer accepts the offer.  *Id.*  The Plaintiffs then allege that after the customers unknowingly agree to purchase Trilegiant's

product, they are returned to their original purchase and only then receive confirmation of the original E-Merchant transaction.  CAC at ¶¶ 7(a), 117(c).  The customer is not aware, however, that on the backend, the token has transferred its personal billing information to Trilegiant, which Trilegiant uses to begin automatically charging the customer a monthly membership fee.  CAC at ¶ 117. The Plaintiffs conclude that "[b]ecause the consumer never has to enter any credit card information during a transaction with Trilegiant, they reasonably believe that they did not make any additional purchases apart from their original transaction with an E-Merchant Defendant."  CAC at ¶ 80.

Third, Trilegiant practices negative option billing, meaning that consumers are automatically charged a monthly membership fee "unless the consumers take affirmative steps to cancel the membership."  CAC at ¶ 81.  The consumers are only made aware of this billing practice by a disclosure in "exceedingly fine print" on Trilegiant's "offer" page.  CAC at ¶ 81.  This is the only detail the Plaintiffs provide regarding the content or presentation of Trilegiant's actual offer page.

Finally, the Plaintiffs allege that months or years after the consumer realizes that he or she has been charged an illegitimate monthly membership fee, the Defendants make it nearly impossible to obtain a full refund through their "refund mitigation strategy."  CAC at ¶ 8.  Refund mitigation is explicitly employed to minimize "the amount of improper charges [the Defendants] would have to refund to the millions of confused and angry consumers . . . ."  CAC at ¶ 83.  As part of this strategy, Trilegiant's call-center employees utilize several stall tactics to frustrate customers attempts to cancel their memberships and receive

6

refunds, including "quickly cancel[ing memberships] without a refund as soon as the customer complains, and demanding that the request for cancelation be in writing." CAC at ¶ 8. The Plaintiffs allege that the E-Merchant Defendants are directly integrated in creating and administering this strategy and have the opportunity to select how many "rebuttals" the call-center employee may pitch during a cancelation call, to participate in the calls, and to review the call-center scripts. CAC at ¶ 8. Disturbingly, the Plaintiffs also allege that before a customer requesting a refund would reach the rebuttal-step stage, call-center employees were instructed to "tell the customers that they somehow signed up for the Membership Programs through their credit card company," instead of explaining to them "the real method" of their enrollment. CAC at ¶ 86. As proof of this intentional deception, the Plaintiffs allege that a 1-800 Flowers representative complained to a Trilegiant representative that "'we have had increasingly more frequent feedback from our own teams that your agents are telling our customers to call us'" when the customers call Trilegiant to cancel their memberships. CAC at ¶ 133. Furthermore, the call centers were supposedly only able to give a maximum refund for two months of membership fees, but if the customer used words such as "fraud," "attorney," "attorney general," or "lawsuit" while on the call, they would be transferred to a call-center manager and could then receive a full refund. CAC at ¶ 86. Ultimately, most customers did not obtain a full refund by calling Trilegiant and were required to submit a written refund request. CAC at ¶ 87.

Once the customers were enrolled in a Trilegiant membership program, the Plaintiffs allege that the E-Merchant and Trilegiant Defendants could only have executed their scheme with the willing participation of the various Credit Card Defendants because the Credit Card Defendants were ultimately responsible for processing the charges.  CAC at ¶¶ 3, 8, 11, 73.  The Plaintiffs concluded that the Credit Card Defendants were knowing-participants in the scheme by, either intentionally or recklessly, ignoring their own policies and their own sophisticated anti-fraud software when reviewing and processing the membership charges.  CAC at ¶¶ 88-95.  As proof for this conclusion, the Plaintiffs generally refer to the "thousands" of complaints that the Credit Card Defendants received over the years the scheme was perpetrated.  CAC at ¶¶ 14, 88-103.  The Plaintiffs further assert that

> [d]espite [the] abundant evidence that Trilegiant's business practices did not meet the Defendant Credit Card Companies' merchant rules, and despite their knowledge that Trilegiant's membership "club" charges are among the highest sources of complaints brought to the attention of their fraud monitoring groups, the Defendant Credit Card Companies continued to process millions of questionable credit and debit charges every month without first verifying the charges with the account holder, as they do with other questionable credit card charges.

CAC at ¶ 93.  The Plaintiffs posit that the only explanation for the Credit Card Defendants' refusal to stop processing the monthly membership charges, is that the Credit Card Defendants were knowing-participants in and "profited from the . . . fraudulent scheme—a scheme that could not have operated without" their participation.  CAC at ¶¶ 85 103.  The Plaintiffs do not allege that the Credit Card

Defendants had any written agreement with the Trilegiant or E-Merchant Defendants specifically related to the alleged online marketing scheme at issue in this case.  Moreover, the Plaintiffs do not allege that the Credit Card Defendants had actual knowledge of the fraud, just that they possessed constructive knowledge of the scheme given the "thousands" of complaints they received over the years the scheme was being perpetrated and Trilegiant's alleged infamous reputation for engaging in fraudulent business conduct.  CAC at ¶ 103. The Plaintiffs' only factual allegation related to Trilegiant's purported infamous business reputation relates to the prior class action litigation and the publicity from the prior government settlements and congressional investigation.

The Plaintiffs also allege that to further the fraudulent scheme, the Defendants "repeatedly used interstate wire and mail communications" including sending "thousands" of messages to the other Defendants discussing various aspects of the scheme.  CAC at ¶ 160.  The Plaintiffs do not allege, however, the actual contents of any such messages aside from the information contained in the credit card and bank account statements that were sent to the Plaintiffs highlighting the membership fee charges.  CAC at ¶ 160(h).  Furthermore, the Plaintiffs do not allege the details of any one fraudulent statement that was made by any Defendant to the Plaintiffs.

Plaintiff DiCarolis alleges that she was a citizen of Oregon who made a purchase on TigerDirect's website prior to July 2010 using a Chase credit card; shortly thereafter, the Plaintiff was enrolled in a Trilegiant membership program, but only noticed the recurring charges around January 2012.  CAC at ¶ 24.

Plaintiff Kelm alleges that she was a citizen of Texas who made an online purchase on Days Inns' website in June 2009 using a credit card; shortly thereafter, she was enrolled in a Trilegiant membership program, but only noticed the recurring monthly charges on her credit card statements more than two years later, around November 2011.  CAC at ¶ 25.

Plaintiff Pham alleges that she was a citizen of California who made an online purchase on Shoebuy's website on December 3, 2009 using her Chase credit card; shortly thereafter, she was enrolled in a Trilegiant membership program, but only noticed the recurring monthly credit card charges nearly two years later, around September 2011.  CAC at ¶ 26.

Plaintiff Reilly alleges that he was a citizen of California who made an online purchase on Buy.com's website with his Chase credit card; shortly thereafter, he was enrolled in a Trilegiant membership program, but only noticed the recurring monthly credit card charges approximately two years later, around January 2012.  CAC at ¶ 27.

Plaintiff Restrepo alleges that he was a citizen of Arizona and claims that his Chase credit card was charged for a Trilegiant membership program starting on May 9, 2007, but he only noticed the recurring monthly credit card charges nearly four years later in April 2011.  CAC at ¶ 28.  He does not allege that he made any online purchases from an E-Merchant Defendant.  *Id.*

Plaintiff Brian Schnabel alleges that he was a citizen of California and claims that he was told he enrolled in a Trilegiant membership program through

Priceline. CAC at ¶ 29. The monthly membership fees were charged to his CitiDiamond Preferred credit card beginning on December 20, 2007, but he only noticed the recurring monthly credit card charges more than two years later in March or April 2010. *Id.*

Plaintiffs Edward and Lucy Schnabel allege that they were citizens of California and claim that they were told they enrolled in a Trilegiant membership program through a rebate. CAC at ¶ 30. The monthly membership fees were charged to their United Mileage Plus credit card beginning on September 21, 2009, but they only noticed the recurring monthly credit card charges six months later on March 9, 2010. *Id.*

Plaintiff Sumlin alleges that she was a citizen of Alabama and claims that her Wells Fargo checking account was charged in April 2012 for a Trilegiant membership. CAC at ¶ 31. She further alleges that her checking account was charged for at least the three or four months prior to April 2012. She does not claim to have been on an E-Merchant Defendant website or that she was charged for her Trilegiant membership by a Credit Card Defendant. *Id.*

Plaintiff Timmcke alleges that she was a citizen of New Mexico who made an online purchase through PeopleFinder's website around August 2011 using a debit card; shortly thereafter, she was enrolled in a Trilegiant membership program, but only noticed the recurring debits two months later, around October 2011. CAC at ¶ 32.

Plaintiff Warfel alleges that she was a citizen of Ohio who had a phone call with Chase's automated services in December 2004; shortly thereafter, her Chase credit card was charged for a Trilegiant membership, but she only noticed the recurring monthly credit card charges more than six years later, around January 2011.  CAC at ¶ 33. She does not allege that she was on an E-Merchant website.

Plaintiff Williams alleges that she was a citizen of North Carolina who made an online hotel reservation through Priceline using her Wachovia debit card on or around May 26, 2009; shortly thereafter, she was enrolled in a Trilegiant membership program, but only noticed the recurring charges around October 2011.  CAC at ¶ 34.

All of the Plaintiffs allege that they did not know of or consent to purchasing a Trilegiant membership and did not use any Trilegiant memberships' services.  CAC at ¶ 35.  Each further alleges that he or she did not receive a full refund.  CAC at ¶¶ 24-34.  Only Plaintiff DiCarolis, however, alleges that Trilegiant continued to charge her account even after she canceled or attempted to cancel her membership.  CAC at ¶ 24.

Based on these allegations, the Plaintiffs have requested individual and class-based relief under several federal and state statutes.  The Defendants' have moved to dismiss the Complaint for failure to state a claim for relief and, in the alternative, to strike portions of the Complaint.

### III.   **Standard of Review**

"A pleading that states a claim for relief must contain: . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Sarmiento v. United States*, 678 F.3d 147, 152 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (citations omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citations and internal quotation marks omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint.  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "At the second step, a court should determine whether the 'well-

pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## IV.   Discussion

The Court will separately address each of the causes of action that the Defendants' argue should be dismissed.

### a.   Violations of RICO, 18 U.S.C. § 1962(c)

The Defendants have moved to dismiss the Plaintiffs' substantive RICO claims on several grounds: (1) the Plaintiffs failed to sufficiently plead a RICO enterprise; (2) the Plaintiffs failed to sufficiently plead a pattern of racketeering activity; and (3) some of the Plaintiffs' claims are barred by the relevant statute of

limitations.  [Dkt. 189-1, Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint or, in the Alternative, to Strike Portions of the Complaint, p. 10-25, hereinafter "MTD"].  The Plaintiffs respond by arguing that they have sufficiently pled an enterprise among all of the Defendants, they have sufficiently alleged with appropriate particularity the pattern of racketeering activity, and none of the Plaintiffs' claims are barred by the statute of limitations.  [Dkt. 219, Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motion to Dismiss, p. 5-37, hereinafter "Opp."].  The Court finds that the Plaintiffs have not sufficiently pled a substantive RICO violation to sustain the Defendants' motion to dismiss.

Notwithstanding the degree of particularity required by the pleading rules in the Federal Rules of Civil Procedure, "[t]o establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute . . . ; (2) an injury to business or property; and (3) that the injury was caused by the violation of" the RICO statute. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citations and internal quotation marks omitted).  To prove a violation of the RICO statute, a plaintiff must plead that the violation occurred through the "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity.'"  *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985); *see also Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 118 (2d Cir. 2013) (the complaint must also allege "'injury to business or property as a result of the RICO violation . . . ' [and] [t]he pattern of racketeering activity must consist of two or more predicate acts of

racketeering") (quoting *Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999)).

### i. RICO Enterprise

The Defendants argue that the Plaintiffs have not adequately pled a RICO enterprise because the Plaintiffs do not allege one enterprise "with an ascertainable structure that works together for a common purpose."  MTD p. 13. They claim that at best the Plaintiffs' allegations show that there were several individual agreements between Trilegiant and each individual E-Merchant, demonstrating parallel conduct, not a unified or concerted scheme.  *Id.* at 14.  The Plaintiffs contend that the facts laid out in the Complaint allege with sufficient particularity one unified enterprise comprised of all the Defendants.  Opp. p. 5. For the reasons below, the Court finds that the Plaintiffs have not sufficiently alleged one enterprise for purposes of a RICO violation.

An "enterprise" is defined as "a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  The definition of enterprise includes legal entities, such as corporations, associations or partnerships, and associations-in-fact.  *See* 18 U.S.C. § 1961(4).  The Plaintiffs attempt to satisfy the enterprise requirement by alleging that the Defendants formed an "association-in-fact" enterprise.  This type of enterprise does not need to have a "hierarchical structure, a chain of command, or other business-like attributes," but it must have "an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it

engages."  *Boyle v. United States*, 556 U.S. 938, 955 (2009).  "From the terms of RICO, it is apparent that an association-in-fact enterprise must have three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Id.*

The Plaintiffs allege a classic "hub-and-spoke" type enterprise which occurs when there are separate, but bilateral, parallel, or vertical relationships between one central actor, the hub, and several independent actors at least one level removed from the hub, the spokes.  Here, the Plaintiffs have alleged that Trilegiant acted as the hub and formed separate contracts with each E-Marketing Defendant, and they, in turn, relied on the help of each Credit Card Defendant to complete the chain.  The Defendants argue that a hub and spoke type enterprise is not sufficient for a cause of action under RICO because the purported spokes are separate, uncoordinated, and entirely independent; thus there are no "relationships" between the spokes creating an ongoing and unified purpose.  MTD p. 13.

Hub-and-spoke enterprises have long been held by courts in this circuit to be insufficient as a matter of law to constitute the requisite enterprise for a RICO violation.  *See City of N.Y. v. Chavez*, 944 F. Supp. 2d 260, 269-76 (S.D.N.Y 2013) (detailing historical treatment of Second Circuit courts finding these enterprises insufficient for RICO claims).  In *Boyle,* however, the Supreme Court altered the analysis and directed courts to liberally and expansively interpret RICO's

enterprise requirement by no longer requiring structural formality as a prerequisite.  *Id.* at 270-271.

In the wake of *Boyle*, there has been no authoritative decision by the Second Circuit offering guidance as to how to interpret the enterprise requirement.  The Third Circuit has, however, found that classic "hub and spoke" enterprises without allegations of a "rim" or "wheel" still do not sufficiently allege a RICO enterprise even post-*Boyle* because they do not, by definition, demonstrate that the "components function as a continuing unit."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327, 374-375 (3d Cir. 2010).

In *In re Insurance Brokerage Antitrust Litig.*, the court dismissed a RICO claim by several insured plaintiffs who alleged several broker-centered enterprises.  *Id.* at 312.  For each alleged enterprise, the plaintiffs accused one insurance broker of forming an agreement with one of several insurance providers to receive hidden brokerage fees for directing certain plaintiff purchasers to those providers.  *Id.*  The court found that because the plaintiffs failed to allege any cooperation between the insurance providers, the plaintiffs only described a pattern of uncoordinated parallel conduct by the providers, not a unified enterprise.  *Id.* at 374-75.  That court did acknowledge, however, that if a plaintiff pled agreement or organized cooperation between the spokes of the enterprise, it could allege a sufficient enterprise under RICO.  *Id.* at 375-76.  This analysis is consistent with the Supreme Court's ruling in *Boyle,* especially since in that case the loosely knit, non-hierarchical core group of individuals, supplemented by recruits on occasion, met before each bank robbery to plan,

gather tools to commit, and assign roles for the commission of each crime. Therefore, even though no strict organization need be found, some structure showing agreement by the parties must be pled for a RICO claim to survive a motion to dismiss.

The Court also finds Judge Forrest's analysis of the "hub and spoke" enterprise in *City of N.Y. v. Chavez*, particularly convincing and thorough. *See Chavez*, 944 F. Supp. 2d at 269-76 (finding that hub and spoke enterprises are no sufficient under RICO even post *Boyle*); *Neiman Marcus Group, Inc. v. Dispatch Trans. Corp.*, No. 09cv6861(NRB), 2011 WL 1142922, at *7 n.11 (S.D.N.Y. March 17, 2011) (finding hub-and-spoke enterprises "do not satisfy the enterprise element of a RICO claim"); *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 135 (E.D.N.Y. 2010) (finding that hub-and-spoke allegations are "insufficient to support a conclusion that the various defendants were associated with one another for a common purpose.").[2]  This Court finds that a classic "hub-and-spoke" formation in which the spokes are separate, distinct and unassociated and whose actions are uncoordinated does not possess the requisite structure to constitute a RICO enterprise, even as that notion was expanded by *Boyle*, because there is no concerted effort or organized cooperation between the spokes.

Here, the Plaintiffs have alleged a series of commercial relationships between the E-Merchant Defendants, the Credit Card Defendants, and the

---

[2] The Plaintiffs are correct that they do not need to allege a formal agreement to allege sufficiently an enterprise under RICO, but they must allege some type of informal cooperation or expectations of reciprocity to show that one enterprise exists. Opp. p. 13-14.

Trilegiant Defendants with the Trilegiant Defendants acting as the hub.  CAC at ¶¶ 4-5, 8, 10-1, 72-87.  There are no allegations that the spokes, comprised of the various E-Merchant Defendants and arguably the Credit Card Defendants, have any agreements or mutual expectations of reciprocal behavior.  At best, the Plaintiffs have alleged a series of bilateral or possibly trilateral agreements between Trilegiant, one E-Merchant Defendant, and possibly one Credit Card Defendant for each alleged fraudulent transaction.  Furthermore, there are no allegations that the various E-Merchant Defendants even knew the identity of the other E-Merchants.  Similarly, there are no allegations that the Credit Card Defendants worked together to ensure a concerted effort to process membership fees for Trilegiant programs.  Without allegations showing that these spokes worked in a concerted manner, the Plaintiffs have not sufficiently alleged an association-in-fact enterprise.

### ii.  Pattern of Racketeering Activity

The Defendants also move to dismiss the Plaintiffs' RICO conspiracy claim, arguing that the Plaintiffs have not sufficiently alleged a pattern of racketeering activity.  MTD p. 17-22.

To plead sufficiently a pattern of racketeering activity, the Plaintiffs must allege a pattern of "two or more predicate acts of racketeering" generally within a period of ten years.  *Lundy*, 711 F.3d at 119 (citing 18 U.S.C. § 1961(5)); *see also Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 167-168 (E.D.N.Y. 2010).  Section 1961(1) sets out an exhaustive list of

predicate acts that qualify as racketeering activity for purposes of RICO. *See In re U.S. Foodservice Inc. Pricing Litig.*, Nos. 3:07MD1894(CFD), 3:06CV1657(CFD), 3:08CV4(CFD), 3:08CV5(CFD), 2009 WL 5064468, at * 16 (D. Conn. Sept. 20, 2010) ("Section 1961(1) sets out an exhaustive list of predicate acts); *see also*, *N.Y. Transp., Inc. v. Naples Transp., Inc.*, 116 F. Supp. 2d 382, 387 (E.D.N.Y. 2000) (same).

The Plaintiffs allege that the Defendants engaged in "predicate acts that constitute violations of the following statutes: (1) 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1341 (mail fraud); and 18 U.S.C. § 1344 (bank fraud)," and by "breaching (1) the settlement agreement they reached with 16 state attorneys general in December 2006, and (2) the settlement agreement they reached with former New York Attorney General Andrew M. Cuomo . . ." CAC at ¶¶ 157, 158. However, only Chase and Trilegiant are alleged to have been parties to the settlement agreements with the attorneys general.

### 1. Mail and Wire Fraud

The Defendants argue that the Plaintiffs fail to allege with sufficient particularity how the Plaintiffs were defrauded by the Defendants' scheme, and without describing the alleged fraudulent activity in more detail, the Plaintiffs' conclusory pleadings must be dismissed. MTD p. 18-21. In fact, they continue, the Plaintiffs do not sufficiently allege how any one mail or wire communication was fraudulent. *Id.* The Plaintiffs respond by arguing that they have sufficiently alleged a fraudulent scheme and that the Defendants used the mail and wires to

further that scheme.  Opp. p. 28.  They further argue that they are not required to allege that any one instance of mail or wire fraud occurred as long as the Defendants used those services in furthering the overall fraudulent scheme.  *Id.* at 29.

Where, as here, a RICO claim's predicate acts include allegations based on fraud, the circumstances constituting the alleged fraud must be pled with the particularity required by Rule 9(b).  Fed. R. Civ. Proc. 9(b); *see also First Capital Asset Mgmt., Inc. v. Santinwood, Inc.,* 385 F.3d 159, 178-179 (2d Cir. 2004).  Generally, a complaint based on fraudulent acts must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993); *see also Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir. 1993) (same); *Eaves v. Designs for Finance, Inc.,* 785 F. Supp. 2d 229, 246-47 (S.D.N.Y. 2011) (same).  In addition to alleging factual particularity with respect to the fraudulent acts, "'the plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'"  *First Capital Asset Mgmt.*, 385 F.3d at 179. (quoting *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 169 (2d Cir. 1999)).  This is done by "(1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *S.W.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir. 1996).

Since the Plaintiffs allege that the Defendants used interstate "wire and mail communications for the purpose of executing and furthering [their] scheme to defraud Plaintiffs and other Class members," they must plead with the requisite particularity detailed in Rule 9(b).  CAC at ¶ 160.  When discussing the use of interstate mail and wire communications, the Plaintiffs allege that the Defendants sent "thousands of electronic, mail and/or telephone communications" regarding various aspects of the scheme.  *Id.* at 160(a)-(h).  For the most part, however, they do not provide the contents of any of those communications, allege the dates and times of any of those communications, or allege the actual author of any of those specific communications.  The only communications that have some detail are the credit card and debit account charges that the Credit Card Defendants sent to the Plaintiffs.  *Id.* 160(h)(i)-(h)(xiv).

In *DeSilva v. N. Shore-Long Island Jewish Health Sys. Inc.*, the court dismissed a RICO claim in which it was alleged that the defendants defrauded plaintiffs by systematically withholding "from plaintiffs their regular or statutorily required rate of pay for all hours worked."  *DeSilva v. N. Shore-Long Island Jewish Health Sys. Inc.*, 770 F. Supp. 2d 497, 511 (E.D.N.Y. 2011).  The plaintiffs in that case alleged that the defendants committed mail fraud by sending plaintiffs "thousand" of "payroll checks . . . that were 'false and deceptive because they misled Plaintiffs and Class Members about the amount of wages to which they were entitled, the number of hours which they had worked, and whether the defendants had included all compensable time . . . .'"  *Id.*  The court found these

conclusory allegations insufficient to maintain a RICO claim because the plaintiffs "failed to identify which defendants caused each allegedly fraudulent statement to be spoken, written, or mailed; what the content of the allegedly fraudulent misrepresentation was; or when the communication was made." *Id.* at 526.  Instead, the "plaintiffs merely allege that unspecified defendants 'repeatedly' mailed payroll checks 'on a regular basis . . . in the last 10 years.'" *Id.*

Similarly here, the Plaintiffs assert generalities, but fail to describe specifically how any mail or wire communication was used to enroll them in the Trilegiant membership programs.  The Complaint asserts that "thousands" of communications were sent between the various Defendants without describing the contents or details of any one mail or wire communication that was fraudulent.  The Plaintiffs instead rely on the hyperbolic conclusory allegation devoid of factual content asserting that the Defendants must have defrauded the Plaintiffs because they were engaged in various aggressive marketing and business tactics that resulted in the Plaintiffs' unknowing enrollment into a membership program.  In their roughly ninety page Complaint, the Plaintiffs do not specifically identify one false statement that a Defendant made to any Plaintiff related to enrolling in a Trilegiant membership program.  On the other hand, the Plaintiffs admit that the Trilegiant offer page disclosed that Trilegiant practices negative option billing, but that this disclosure was in "exceedingly fine print." CAC at ¶ 81.  Even though they admit that there was a product offer page, they fail to describe any of the other conditions *or omissions* on that page.  Without at

least alleging how any mail or wire communication was used to further the fraudulent scheme, let alone when the communication was made and by whom, the Plaintiffs have only provided the type of conclusory statements that Rule 9(b) is meant to preclude.  *See also In re Glenfeld Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) ("plaintiff must set forth more than neutral facts necessary to identify the transaction. . . . In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading."), *superseded by statute on other grounds* as stated in *SEC v. Todd*, 642 F.3d 1207, 1216 (9th Cir. 2011).

To satisfy the particularity requirement of Rule 9(b), the Plaintiffs claim that they only need to detail the general contours of the RICO scheme and how the use of the mail and wires furthered that fraudulent scheme.  Opp. p. 26.  In *In re U.S. Foodservice Inc. Pricing Litig.*, the court agreed and held that in complex fraud cases, the complaint does not need to allege the geographical and temporal details of every mail and wire transmission alleged to be a predicate act as long as the "defendant is on notice of the circumstances of the alleged fraud."  *In re U.S. Food Service Inc. Pricing Litig.*, 2009 WL 5064468, at *18.  The Plaintiffs' allegations here though are substantially less detailed than the allegations in that case.

In *In re U.S. Food Service, Inc.*, the plaintiffs alleged that the defendant enterprise "participated in a scheme to falsely inflate the cost component of the price charged to" the enterprise's customers for certain goods.  *Id.* at *17.  As part of this scheme, the defendants agreed to artificially inflate the cost of the

25

goods through a series of purchases and sales among themselves.  *Id.*  The plaintiffs then relied on the defendants' misrepresentations about their purchase price for the goods in agreeing to purchase the goods from the defendants for an inflated amount.  *Id.*  The plaintiffs alleged that the invoices and contracts that the resaler defendant sent them constituted the predicate acts of mail fraud under RICO because the invoices and contracts listed a fraudulent value for the goods. *Id.*  In this instance, the court found that it did not need the plaintiffs to plead the specific dates and details of every invoice or contract because the "thousands of separate fraudulent transactions" only furthered the fraudulent scheme that the plaintiffs sufficiently pled.  *Id.* at *18.  In our case, however, the Plaintiffs have not even alleged how they were defrauded.  Even drawing all reasonable inferences for the Plaintiffs at this stage, without alleging with some particularity how the Defendants defrauded them, the Court cannot find that the contours of the fraudulent scheme have been sufficiently alleged to justify relying on general allegations to sufficiently plead a pattern of racketeering activity.[3]

　　Finally, it is unclear to the Court based on the arguments and pleadings whether the Plaintiffs are alleging that datapass is inherently fraudulent or

---

[3]  The Plaintiffs also allege that as part of the fraudulent RICO scheme, the Credit Card Defendants sent "[t]housands of electronic or mail transmissions of credit or debit card statements to Plaintiffs and Class Members [that] contain the fraudulent charges."  CAC at ¶ 160(h).  The Court is puzzled as to how these communications furthered the fraudulent scheme because they would have revealed, as they eventually did, not concealed the charges.  *See Lundy*, 711 F.3d at 119-120 (mailing of pay stubs showing that the plaintiffs were underpaid was not in furtherance of a fraudulent scheme because the mailings would have revealed the alleged fraud).  Moreover, credit card companies are legally required to send customers monthly statements of their charges.  *See* 15 U.S.C. § 1666b. The Court doubts that the Plaintiffs intend to suggest that compliance with a federal consumer protection law constitutes a RICO violation.

whether it was an aspect of the mail and wire fraud discussed above.  If the marketing scheme was meant to be included as an aspect of mail and wire fraud, it does not change the outcome of the Court's conclusion because the Plaintiffs have not alleged the Defendants' statements or omissions that defrauded them.

To the extent that the Plaintiffs allege that datapass is inherently fraudulent, their claims also fail because they have not told this Court why datapass is always fraudulent, despite the fact that a particular point in time some members of Congress concluded that certain unspecified practices labeled "datapass" were improper.  For example, there are no allegations that datapass ineluctably results in automatic charges without the consumer's knowledge and consent.  Retailers constantly adapt to evolving legal mandates and market demands, and it is not alleged that datapass does not serve some potentially valid underlying sales purpose in helping willing consumers efficiently make online purchases.  Without alleging with any particularity how the Plaintiffs were allegedly defrauded into purchasing the Trilegiant memberships, the Court cannot find that datapass is inherently fraudulent in this case.[4]  Moreover, without

---

[4] The Plaintiffs rely on *United States v. Warshank* to support their claim that they have sufficiently pled the requisite particularity for a RICO claim.  Opp. p. 33.  In *Warshank*, the court confirmed a RICO criminal conviction for mail fraud when the defendants charged the plaintiffs for online purchases without informing the plaintiffs "during the ordering process that they would be charged for anything beyond the shipping-and-handling costs associated with the trial offer."  *United States v. Warshank*, 631 F.3d 266, 311 (6th Cir. 2010).  Had the Plaintiffs here alleged that they were not told about the negative billing option or the membership program, the outcome of this motion might be drastically different.  Unlike in *Warshank*, the Plaintiffs here have not alleged what they were and what they were *not* told.  Without alleging these facts or omissions, the Court cannot determine how or even if the Defendants misrepresented the nature of the charges for the membership programs.

detailed allegations describing what the Plaintiffs did and did not see and when, it is impossible to discern that the Plaintiffs were defrauded.  *See Berry v. Webloyalty.com, Inc.*, No. 10-cv-1358-H(CAB), 2010 WL 8416525, at *5 (S.D. Cal Nov. 16, 2010) (customer error in failing to read the fine print or in failing to review the details of an online purchase does not convert the defendant's actions into a pattern of racketeering activity).

## 2.  Bank Fraud

The Defendants also argue that the Plaintiffs have no standing to allege predicate acts of bank fraud.  MTD p. 23.  The Plaintiffs failed to respond to the Defendants' argument on this point.  Given the law on this issue, it would appear that the Plaintiffs concede this point, as they do not expressly contest it, but the Court will address the merits regardless.  To the extent that this claim still remains, the Plaintiffs cannot allege bank fraud as a predicate act under RICO. *See Chanof v. U.S. Surgical Corp.*, 857 F. Supp. 1011, 1023 (D. Conn. 1994) (dismissing claims in the pleadings because plaintiffs failed to respond to defendant's motion to dismiss on these claims).

Bank fraud provides criminal liability for anyone who "knowingly executed, or attempts to execute, a scheme or artifice -- (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1344.  As the statute's language makes patently clear, the bank fraud statute

protects financial institutions from being the victims of fraudulent activity. *See United States v. Chandler*, 98 F.3d 711, 715 (2d Cir. 1996) (finding that in the criminal context, "to obtain a bank fraud conviction under subsection (1) alone, the Government must prove beyond a reasonable doubt that the defendant engage[d] in or attempt[ed] to engage in a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into released property") (citations and internal quotation marks omitted); *United States v. Boceanu*, No. 07-cr-00012, 2013 WL 441072, at *2 (D. Conn. February 4, 2013) (finding that an element to prove a conspiracy to commit bank fraud includes an "agreement to engage in a scheme or artifice to defraud, or obtain money or property from, a federally-insured financial institution"); *Edmonds v. Seavey*, No. 08-cv-5646, 2009 WL 2949757, at *6 n.8 (S.D.N.Y. Sept. 15, 2009) (stating that "a Rico plaintiff who is not a financial institution under the statute lacks standing or injury to bring a RICO claim based on bank fraud").

Here, the Plaintiffs do not allege that any financial institution was harmed. Conversely, the Plaintiffs allege that several financial institutions, or Credit Card Defendants, are part of the RICO enterprise engaged in defrauding the Plaintiffs. The Plaintiffs, therefore, may not rely on bank fraud as a predicate act.

### 3. Breach of the Settlement Agreement

The Defendants argue that the Plaintiffs cannot assert breaches of settlement agreements as predicate acts under RICO because breach of contract is not an enumerated predicate act. MTD p. 22-23. In response, the Plaintiffs

implicitly concede this point, but assert that "[w]hile breaching the settlement agreement is not one of the enumerated predicate acts that constitute racketeering activity as set forth in [the statute], it is one of the bases Plaintiffs have alleged to establish the Defendants' fraudulent intent and a pattern of racketeering."  Opp. p. 32, n.23.  From the Complaint and the Plaintiffs' response, it is apparent that the alleged breaches are potentially used for two purposes: (1) as a substantive predicate act under the statute; and (2) to help prove the requisite fraudulent intent.

The list of predicate acts in 18 U.S.C. § 1961 is exhaustive.  *See O'Malley v. N.Y. City Transit Authority*, 896 F.2d 704, 707-08 (2d Cir. 1990) (finding that state obstruction of justice is not a RICO predicate offense because it was not expressly listed in the statute); *Binghamton Masonic Temple, Inc. v. Marin*, 189 F.3d 460 (2d Cir. 1999) (unpublished opinion) ("As to the RICO claims, plaintiff lists numerous predicate acts, but amongst those only securities fraud, mail fraud, wire fraud and bank fraud are recognized predicate acts under RICO."); *Harvey v. Harvey*, 931 F. Supp. 127, 130 (D. Conn. 1996) ("The offenses which may serve as predicate acts for a RICO claim are listed in 18 U.S.C. § 1961 . . . [and] [t]he list is exclusive.").  Since breaching a contract or, more specifically, a settlement agreement is not one of the offenses listed in 18 U.S.C. § 1961(1), it cannot serve as a predicate act to a RICO violation.[5]

---

[5] Even though the Plaintiffs may have sufficiently pled the Defendants' fraudulent intent to commit two predicate acts, the Court does not need to engage in this inquiry because the Plaintiffs have failed to allege sufficiently a pattern of racketeering activity to sustain a motion to dismiss.

### iii.  RICO Statute of Limitations

The Defendants also argue that any RICO claim brought by Plaintiffs Warfel, Reilly, and Restrepo are barred by the relevant statute of limitations.  MTD p. 23-25.  In response, the Plaintiffs argue that the statute of limitations was tolled because the Plaintiffs "suffered new and independent injuries with each imposition of a Trilegiant credit card charge on a class member, as the factual allegations of the CAC show that post-transaction marketing, data pass fraud, negative option billing and industrial scale 'refund mitigation' continued unabated for years until after these actions were filed."  Opp. p. 87.

Even though the RICO statute does not provide for a specific statute of limitations, the Supreme Court announced a uniform four-year limitations period for civil RICO actions.  *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156-57 (1987).  Although the Supreme Court has yet to specify when the RICO period of limitations begins to run, the Second Circuit has held that it "begins to run when the plaintiff discovers or should have discovered the RICO injury."  *In re Merrill Lynch P'ship Litig.*, 154 F.3d 56, 58 (2d Cir. 1998).  "The first step in the statute of limitations analysis is to determine when the [plaintiff] sustained the alleged injury for which [the plaintiff] seek[s] redress.  [The Court] then determine[s] when [the plaintiff] discovered or should have discovered the injury and begin[s] the four-year statute of limitations period at that point."  *Id.* at 59 (citations and internal quotation marks omitted).

The Second Circuit also "recognizes a 'separate accrual' rule under which a new claim accrued and the four-year limitation period begins anew [for a civil RICO claim] each time a plaintiff discovers or should have discovered a new and independent injury.'" *Id.* at 58.  As other courts in this circuit have noted, the case law "leaves some ambiguity as to precisely what constitutes a 'new and independent injury.'"  *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 448 (E.D.N.Y. 2007) (citations omitted).

### 1.  Date of the Injury

First, the Court must determine when the alleged injury occurred. According to the Complaint, Plaintiff Warfel was enrolled in one of Trilegiant's monthly membership programs in or around December 2004; Plaintiff Reilly was enrolled in one of Trilegiant's monthly membership programs in or around May 2007; and Plaintiff Restrepo was enrolled in one of Trilegiant's membership programs on May 9, 2007.  CAC at ¶¶ 27, 28, 33.  Each of the Plaintiffs also alleges that they were shortly thereafter charged monthly fees for the Trilegiant memberships.  *Id.*  The Plaintiffs argue, however, that each monthly charge constituted a new and independent injury under the separate accrual doctrine. Opp. 87.  The Court disagrees with this contention.

The facts of this case are substantially similar to those in *In re Merrill Lynch Partnerships Litig.*, and warrant a finding that no new and independent injury occurred after the initial membership enrollment.  In that case, the plaintiffs alleged that the defendant scammed real estate investors into purchasing

ownership interests in a series of limited partnerships even though the defendant knew that the partnerships could not make the advertised gains. *In re Merrill Lynch Partnerships Litig.*, 154 F.3d at 57-58. The defendant was alleged to have sold the investments hoping to "collect significant fees during the course of the partnership life." *Id.* at 59. The plaintiffs alleged they sustained new and independent injuries every time the defendant collected annual partnership fees and every time they received marketing materials designed to reinsure the investors of the strength of their investments. *Id.* The court found, however, that "later communications, which put a gloss on the losing investments, were continuing efforts to conceal the initial fraud, and not separate and distinct fraudulent acts resulting in new and independent injuries." *Id.* at 60. Similarly, "the collection of annual fees [that] occurred in each year of the life of the partnerships . . . cannot be viewed as a separate and distinct fraud creating new injuries as it was simply a part of the alleged scheme." *Id.* at 60.

The Plaintiffs unavailingly rely on *AMA v. United Healthcare Corp.* In that case, the defendant healthcare company was accused of continually manipulating the databases responsible for establishing reimbursement rates for out-of-network reimbursement claims. *AMA v. United Healthcare Corp.*, No. 00 Civ. 2800(LMM), 2006 WL 3833440, at *2 (S.D.N.Y. Dec. 29, 2006). The court found that each time a new reimbursement rate was determined, the plaintiffs suffered a new and independent injury. *Id.* at *10. Important for that determination was the fact that the new reimbursement rates were themselves fraudulent. The Plaintiffs here have only alleged that they were fraudulently enrolled into a membership

program that automatically charged them monthly dues based on the billing information provided by the Credit Card Defendants.  The charges appeared accurately and timely on each of the Plaintiff's credit card or debit account statements.  Unlike in *AMA v. United Healthcare Corp.*, the Defendants committed no other continuing fraudulent actions related to the initial scheme that would cause new and independent injuries.  Instead, once the Plaintiffs were enrolled in the membership, the initial fraudulent part of the alleged RICO scheme was completed.

Here, the facts are more akin to *In re Merrill Lynch Partnerships Litig.*  The Plaintiffs allege that they were fraudulently induced to enroll in Trilegiant's membership programs through a complex scheme involving several questionable business practices.  CAC at ¶¶ 74-87.  The scheme resulted in the Plaintiffs' enrollment in one of the membership programs without their explicit authorization or consent.  Each Trilegiant membership charge later collected was simply one in a series of charges unwittingly authorized by and incident to the initial enrollment.

As the Plaintiffs concede, negative option billing is used to make "[a]ffirmative consumer action . . . impossible" until consumers become aware that they have been enrolled in the membership program, which "does not occur until months, if not years, after Trilegiant first begins to charge recurring membership fees."  CAC at ¶ 82.  Refund mitigation, furthermore, is used only to "minimize the amount of improper charges [Trilegiant] would have to refund to . . . consumers who eventually discover that they have been unknowingly enrolled

in the Membership Programs and charged unauthorized monthly fees."  CAC at ¶ 83.  This post-enrollment conduct was not used to create new and independent RICO-related injury, but was meant to conceal and further the initial fraud.

## 2. Knowledge or Constructive Knowledge

Second, the Court now must determine when the Plaintiffs discovered or should have discovered the injury.  In the Second Circuit, actual knowledge of the fraudulent scheme is not necessary; an objective standard is used to impute knowledge to the victim when sufficient "storm clouds" are raised to create a duty to inquire.  *See Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993) ("'[t]he means of knowledge are the same thing in effect as knowledge itself,' and, therefore, 'when the circumstances would suggest to a [person] of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the [plaintiff] who does not make such an inquiry.'") (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983)).  Since inquiry notice is a factual examination, "making this determination is frequently inappropriate on a motion to dismiss and is only proper . . . when the complaint and documents which the court may take notice of clearly show that the claims are barred as a matter of law." *Lorber v. Winston*, No. 12-cv-3571(ADS)(ETB), 2013 WL 3424173, at *20 (E.D.N.Y. July 3, 2013) (citations and internal quotation marks omitted).  Importantly, the storm warnings "need not detail every aspect of the alleged fraudulent scheme," but must suggest to a person of ordinary intelligence the probability of fraudulent activity.  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547

F.3d 406, 427 (2d. Cir. 2008); *Marshall v. Milberg LLP*, No. 07-cv-6950(LAP), 2009 WL 5177975, at *3 (S.D.N.Y.  Dec. 23, 2009).

In this case, the Plaintiffs admit that after they were enrolled in Trilegiant's membership programs, they received "credit or debit card statements . . . containing the fraudulent charges."  CAC at ¶ 160(h).  However, they allege that they only "noticed the recurring charges" years after the initial enrollment.  CAC at ¶¶ 27-29, 33.  The Plaintiffs claim, therefore, that they had no actual or constructive knowledge of the fraudulent activity.  The Court, drawing all inferences in favor of the Plaintiffs, finds that the Plaintiffs did not have actual knowledge of the injury at the time of enrollment.  The question before this Court, then, is when the Plaintiffs were on sufficient inquiry notice of the scheme to start running the statute of limitations.

Since the Plaintiffs admit that they received credit card or debit account statements accurately reflecting the amounts charged for the membership programs shortly after enrolling in the programs, the Court must determine if this placed them on sufficient inquiry notice of the alleged scheme.  In a case brought under the Truth in Lending Act, in which a president of a company sought reimbursement for what he alleged were unauthorized charges by one of his employees on the corporate credit card, the Second Circuit found that the credit card company was not liable for reimbursement.  *Minskoff v. Am. Express Travel Related Servs. Co., Inc.*, 98 F.3d 703, 708-10 (2d. Cir. 1996).  Importantly, the court stated that "once a cardholder receives a statement that reasonably puts him on notice that one or more fraudulent charges have been made, he cannot thereafter

claim lack of knowledge." *Id.* at 710.  Even in complex securities litigations, the "information that triggers inquiry notice of the probability of an alleged securities fraud is *any* financial, legal, or other data . . . ."  *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 343-344 (S.D.N.Y. 1999) (emphasis added); *Kosovich v. Thomas James Assocs., Inc.*, No. 93-cv-5443(AGS), 1995 WL 135582, at *3-4 (S.D.N.Y. Mar. 29, 1995); *Dodds v. Cigna Sec., Inc.*, 841 F. Supp. 89, 94 (W.D.N.Y. 1992), *aff'd*, 12 F.3d 346 (2d Cir. 1993).

In *Dodds*, the court found that the inexperienced-investor plaintiff was on inquiry notice that she may have been defrauded by her investment manager because she had access to the prospectuses of the companies in which he proposed to invest.  *Dodds*, 841 F. Supp. at 94.  The court stated that a person of ordinary intelligence would have been put on inquiry notice through these materials, and the plaintiff's claims that she did not read the documents because they were overly complex were unavailing because "[a] plaintiff is not free to ignore pertinent documents even if she is not able to fully understand their meaning."  *Id.*

Accordingly, this Court follows the general consensus in this circuit and finds that receiving credit card statements, far less impenetrable than corporate securities filings, should have given the Plaintiffs sufficient inquiry notice of the fraudulent scheme.  Indeed, the Plaintiffs own allegations prove this to be true because the Plaintiffs only discovered the charges after eventually reviewing their credit card or debit card statements.  CAC at ¶¶ 24-34.  Had the Plaintiffs

reviewed their credit card statements earlier than when they finally did, they *would* have been aware of the charges.

In the Complaint, Plaintiff Warfel admitted that around December 2004, she was enrolled in a Trilegiant membership program and the monthly charges commenced "[s]oon thereafter." CAC at ¶ 33. Warfel's initial complaint was filed in the Southern District of Ohio on August 4, 2011, more than six years after she should have known of the injury. Opp. p. 83. Her RICO claims, therefore, would be barred by the statute of limitations.

Plaintiff Reilly was enrolled in a Trilegiant membership program around May 2007. CAC at ¶ 27. Reilly filed a complaint on March 7, 2012, more than four years after he should have known of the injury. His RICO claims, therefore, would be barred by the statute of limitations.

Finally, Plaintiff Restrepo claimed that on "May 9, 2007, Trilegiant Charged" his Chase MasterCard. CAC at ¶ 28. Restrepo's initial claim was filed on July 13, 2011 in the District of Arizona, just over four years after the initial charge. Even assuming that the charges did not appear until his June statement, his RICO claims would still be barred by the statute of limitations.

For the foregoing reasons, the Court finds that the Defendants' motion to dismiss the Plaintiffs' substantive RICO claims is GRANTED, and it is so ordered.

### b. Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)

The Defendants also move to dismiss the Plaintiffs' claim for a conspiracy to violate RICO because (1) the Plaintiffs have failed to sufficiently plead a substantive RICO violation; and (2) the Plaintiffs failed to allege any agreement by

the Defendants.  MTD p. 25-27.  The Plaintiffs respond by arguing that they are not required to plead all of the elements of a substantive RICO violation for a conspiracy cause of action, and they have sufficiently alleged an agreement of the conspiracy through each participant's knowledge of the RICO scheme.  Opp. 44-59.

The RICO statute makes it unlawful for "any person to conspire" to violate RICO.  18 U.S.C. § 1962(d).  To establish a conspiracy claim pursuant to this statute, a "plaintiff must establish 'as to each alleged co-conspirator: (1) an agreement to join the conspiracy; (2) the acts of each co-conspirator in furtherance of the conspiracy; [and] (3) that the co-conspirator knowingly participated in the same."  *Valenti v. Penn. Mut. Life Ins. Co.*, 850 F. Supp. 2d 445, 450-451 (S.D.N.Y. 2012), *aff'd*, 511 F. App'x 57 (2d Cir. 2013) (citations omitted); *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009) (a RICO conspiracy requires allegations that the defendant agreed to participate "'in a charged enterprise's affairs' through a pattern of racketeering, 'not a conspiracy to commit predicate acts.'") (quoting *United States v. Persico*, 832 F.3d 705, 714 (2d Cir. 1987)); *N.Y. Dist. Council of Carpenters Pension Fund v. Forde*, No. 11 Civ. 5474(LAP), 2013 WL 1454954, at *10 (S.D.N.Y. Mar. 26, 2013) ("To establish a RICO conspiracy, a plaintiff must plead that a defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity.").

In this circuit, analysis of any RICO conspiracy claim begins with the premise that it necessarily fails where the underlying substantive claim is insufficiently pled.  *See First Capital Asset Mgmt., Inc.* 385 F.3d at 182; *Ozbakir v.*

*Scotti*, 764 F. Supp. 2d 556, 573-74 (W.D.N.Y. 2011) ("To the extent that plaintiffs

seek to assert a RICO conspiracy claim under 18 U.S.C. § 1962(d), such a claim

also fails, because it is based on the defectively pleaded substantive RICO

Claims."); *Allen v. New World Coffee, Inc.*, No. 00-cv-2610, 2002 WL 432685, at *6

(S.D.N.Y. March 19, 2002) ("'Any claim under § 1962(d) based on conspiracy to

violate the other subsections of section 1962 must fail if the substantive claims

are themselves deficient.'") (quoting *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055,

1064 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998)); *Denny v. Ford

Motor Co.*, 959 F. Supp. 2d 262, 274 (N.D.N.Y. 2013) ("Because plaintiffs'

substantive RICO claims are untimely, their conspiracy to violate RICO claim

must fail as a matter of law.").

The Plaintiffs do not directly respond to the Defendants' argument on this

point.  Accordingly, the Plaintiffs claim for a RICO conspiracy must be dismissed

because they have failed to allege sufficiently a substantive RICO violation as

discussed *supra*.[6]

Even so, the Plaintiffs' RICO conspiracy claim fails for independent

reasons.  If the Plaintiffs do not need to allege an actual enterprise to fulfill the

requirements for a RICO conspiracy claim, they must at the very least allege an

agreement to commit the predicate acts.  *See Hecht v. Commerce Clearing*

---

[6] Even if the Plaintiffs are not required to allege an enterprise for a RICO
conspiracy claim, they have not sufficiently alleged a pattern of racketeering
activity or even an agreement to commit such acts.  For those independent
reasons, the Complaint is insufficient.  *See United States v. Applins*, 637 F.3d 59,
75 (2d Cir. 2011) (finding that a RICO enterprise does not need to be proved
beyond a reasonable doubt to sustain a RICO conspiracy conviction).

*House, Inc.*, 897 F.2d 21, 25 (2d. Cir. 1990) ("Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement."); *Book v. Mortg. Elec. Registration Sys.*, 608 F. Supp. 2d 277, 282 (D. Conn. 2009).  Here, the Plaintiffs allege in a conclusory fashion that the "Defendants agreed with each other to enter into a conspiracy to, and did, in fact, conduct and participate in the affairs of the RICO Enterprise, directly or indirectly, through a pattern of racketeering activity."  CAC at ¶ 176.  The Plaintiffs never allege, however, how or when all of the Defendants formed such an agreement.  The Plaintiffs explicitly allege the existence of agreements between Trilegiant and each E-Merchant Defendant and between Trilegiant and some Credit Card Defendants, as related to separate marketing initiatives, but they do not allege one agreement where all of the Defendants conspired together to engage in one fraudulent scheme.  CAC at ¶¶ 5-8, 83-87, 103, 117.  All the Plaintiffs have done is "taken a series of events involving various individuals and entities, and various communications among them, and attempted to 'connect the dots,' hoping that when they finish, a RICO claim will emerge.  The federal rules of pleading have been designed to discourage such attempts . . . ." *Ozbakir*, 764 F. Supp. 2d at 573.

The Plaintiffs argue that at the pleading stage, they must only allege that the co-conspirators knew the general nature and contours of the conspiracy, not that they actually had any agreement to commit RICO violations.  Opp. p. 46.  The cases the Plaintiffs cite, however, do not stand for the proposition that the only requirement to allege sufficiently a RICO conspiracy is knowledge of it.  For

example, in *United States v. Zichetello*, the court addressed whether co-conspirators needed to know and agree to the racketeering activity of the enterprise for the government to sustain a RICO conspiracy conviction.  *United States v. Zichetello*, 208 F.3d 72, 99 (2d Cir. 2000).  The court held that the government did not need to prove that each co-conspirator agreed to commit all of the predicate acts, instead, "[a]ssuming that a RICO enterprise exists, the government must only prove that the defendant[s] . . . know the general nature of the conspiracy and that the conspiracy extends [their] individual role[s]."  *Id.* (citations and internal quotation marks omitted).  The court's analysis was explicitly based on the assumption that "a RICO enterprise exists."

When a plaintiff sufficiently alleges an enterprise, they allege by definition an explicit or implicit agreement among the defendants.  Here, however, the Plaintiffs have not sufficiently alleged an enterprise.  Moreover, the Plaintiffs are attempting to allege, it seems, that mere knowledge of a conspiracy's actions makes the person with that knowledge liable as a co-conspirator.  Knowledge alone cannot be enough to subject a person to criminal and civil liability for conspiracy.  Without alleging an agreement, the Plaintiffs cannot show that the Defendants have in fact agreed to conspire together to violate RICO.

Finally, the Plaintiffs' RICO conspiracy claim also fails because the allegations therein "contain no more specificity than the other allegations in the complaint."  *Ozbakir*, 764 F. Supp. 2d at 574 (dismissing a RICO conspiracy claim because the substantive RICO violation was not sufficiently pleaded, and the RICO conspiracy allegations contained no more specificity than the substantive

RICO allegations).  Therefore, the Complaint has not complied with the heightened requirements of Rule 9(b) even though it relies on a pattern of racketeering activity based on fraud.

For the foregoing reasons, the Defendants' motion to dismiss the RICO conspiracy claims is GRANTED.

### c.   Claim for Violations of ECPA, 18 U.S.C. §§ 2510, *et seq.*

The Trilegiant and E-Merchant Defendants move to dismiss the Plaintiffs' ECPA claims because the Plaintiffs have failed to allege that the interception occurred contemporaneously to the communications' transmissions, and, in the alternative, that several of the Plaintiffs' claims are barred by the relevant statute of limitations.  MTD p. 27-29.  The Plaintiffs argue that they are not barred by the statute of limitations because they were not put on notice of the violation, and they have sufficiently alleged interceptions for purposes of the statute.  Opp. 89-96.  For the reasons set forth below, the Court finds that some of the Plaintiffs' claims are not barred by the statute of limitations and that the Complaint adequately asserts a violation of ECPA.

### i.   ECPA "Interception"

ECPA provides a civil cause of action against persons who intentionally intercept, endeavor to intercept, or procure others to intercept electronic communications.  18 U.S.C. §§ 2511.  Courts addressing the term "intercept" have narrowly defined it to encompass only "'acquisitions of communications contemporaneous with transmission, not storage.'"  ***Snyder v. Fantasy***

*Interactive, Inc.*, No. 11-cv-3593(WHP), 2012 WL 569185, at *2 (S.D.N.Y. Feb. 9, 2012); *Conte v. Newsday, Inc.*, 703 F.Supp.2d 126, 139 at n. 11 (E.D.N.Y. 2010); *Knop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002); *see also, Fraser v. Nationwide Mut. Ins., Co.*, 352 F.3d 107, 113-14 (3rd Cir. 2003) (following Fifth, Ninth, and Eleventh Circuits and interpreting intercept narrowly); *United States v. Meriweather*, 917 F.2d 955, 960 (6th Cir. 1990).  While the Second Circuit has yet to rule definitively on this issue, it has implied in *dictum* that it is not persuaded that an interception of a wire or communication can only occur while the communication is in "transit."  *See Hall v. Earthlink Network, Inc.*, 396 F.3d 500, n.1 (2d Cir. 2005).

For purposes of this motion to dismiss, however, the Court does not need to decide whether an interception must be contemporaneous to the communication's transit because even assuming the Defendants' standard is correct, the Plaintiffs have sufficiently alleged the temporal requirement.  Several Plaintiffs have claimed that while making purchases on the E-Merchant Defendants' websites, they entered their confidential billing information which was then stored in an online token to be transferred to Trilegiant at some point in the transaction.  CAC at ¶ 117.  After entering their account information, the Plaintiffs were taken to Trilegiant's offer page to complete a secondary purchase without receiving confirmation that the first transaction was completed.  CAC at ¶¶ 74, 117.  They would only receive confirmation of their initial purchase after reviewing Trilegiant's offer page.  CAC at ¶¶ 74, 117.  Based on the allegations, and drawing all inferences in favor of those allegations, the Plaintiffs have alleged

two alternative "interceptions."  The first could have occurred when the token stored the Plaintiffs' confidential billing information.  *See* 18 U.S.C. § 2511(2)(d); C*aro v. Weintraub*, 618 F.3d 94, 97-98 (2d Cir. 2010) (finding that a party to a communication can intercept the communication if it clandestinely records a conversation with the intention to commit a tort or other crime with the intercepted communication).  That interception would have occurred the moment the Plaintiffs sent their billing information to the E-Merchant Defendant; thus, occurring contemporaneously to the communication's transmittal.  An interception does not require immediate use of the intercepted information, so the fact that the token may have only saved the data is irrelevant.  The second interception could have been when the billing information was sent to Trilegiant.  Even though other courts have interpreted interception "narrowly," they were only distinguishing between communications that were either in transit or in storage.  *See Konop*, 302 F.3d 868 at 878-79.  Here, the Plaintiffs' confidential billing information would not have been "in storage" until after the entire transaction with the E-Merchant was completed, and an online purchase is completed only when the customer receives a purchase confirmation page from the vendor.  Before that time, the communications related to the transaction are not "in storage" and, therefore, are more properly defined as in a state of transit.  Accordingly, the Plaintiffs have sufficiently alleged that the communications were intercepted contemporaneously to their transmissions and have sufficiently alleged violations of ECPA.

ii. **ECPA Statute of Limitations**

The Defendants also argue that several of the Plaintiffs' ECPA claims are barred by the relevant statute of limitations.  Neither party contests that the applicable statute of limitations for an ECPA claim is "two years after the date upon which the claimant first had a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e); *see also In re State Police Litig.*, 888 F. Supp. 1235, 1248-249 (D. Conn. 1995); *Schmidt v. Devino*, 106 F. Supp. 2d 345, 349-50 (D. Conn. 2000).  Courts in this district have held that the merest inquiry notice is sufficient to start the statute of limitations running absent allegations of fraudulent concealment.  *Id.*

Even though the "violation" that is referenced in the statute is the interception of the communication, not the injury caused by the interception, the Plaintiffs only need to be on inquiry notice of the violation to commence the statute of limitations period.  Contrary to the Plaintiffs' contentions, they did not need to be on notice of the actual violation, just on notice to inquire about the injury they had received.  The credit card and debit account statements should have alerted the Plaintiffs that "something was afoot."  *See Davis v. Zirkelbach*, 149 F.3d 614, 618 (7th Cir. 1998).  Had they inquired about the injury, they would have discovered the alleged violation.  Since the Court has already held that the Plaintiffs' financial statements were sufficient to put them on inquiry notice, it must only determine when the Plaintiffs first received their statements with the relevant membership charges.

Plaintiff Kelm alleges that shortly after June 2009, her credit card was charged for a membership fee.  CAC at ¶ 25.  Plaintiff Pham alleges that from January 11, 2010 to August 11, 2011, her credit card was charged for monthly membership fees.  CAC at ¶ 26.  Plaintiff Reilly alleges that shortly after May 2007, his credit card was charged for a membership fee.  CAC at ¶ 27.  Plaintiff Restrepo alleges that on May 9, 2007, his credit card was charged for a membership fee.  CAC at ¶ 28.  Plaintiff Brian Schnabel alleges that on or about December 20, 2007, his credit card was charged a membership fee.  CAC at ¶ 29. Plaintiff Warfel alleges that shortly after December 2004, her credit card was charged a membership fee.  CAC at ¶ 33.  Finally, Plaintiff Williams alleges that in August 2009, her debit card was charged a membership fee.  CAC at ¶ 34.  All of these Plaintiffs alleged they received membership charges more than two years prior to filing their relevant complaints, and none of these Plaintiffs allege any irregularity in the customary posting of credit card charges; therefore, the Court construes the Complaint to allege that the Trilegiant membership fee appeared on the Plaintiffs' credit card statements issued in the month immediately following their enrollment in the Trilegiant membership program.  Accordingly, their ECPA claims are barred by the statute of limitations.

The Defendants' motion to dismiss the ECPA claims asserted by Plaintiffs Kelm, Pham, Reilly, Restrepo, Brian Schnabel, Warfel, and Williams against the Trilegiant and E-Merchant Defendants is GRANTED as barred by the statute of limitations; while the motion to dismiss those claims asserted by the Plaintiffs DiCarolis, Edward and Lucy Schnabel, Sumlin, and Timmcke is DENIED.

**d.   Claims for Violations of CUTPA, Conn. Gen. Stat. § 42-110a, *et seq.*__

The Defendants first move to strike the pleadings as related to the CUTPA class action claim on the ground that CUTPA does not allow for a class action when a Connecticut resident is not a named plaintiff.  MTD p. 32-33.  The Defendants also move to dismiss the CUTPA claim arguing that the Plaintiffs have not sufficiently alleged a substantive CUTPA violation and that several claims are barred by the relevant statute of limitations.  MTD p. 33-36.  The Plaintiffs argue that (1) the motion to strike is untimely and procedurally improper; (2) Rule 23 supersedes the class restrictions in CUTPA; and (3) the Plaintiffs have sufficiently alleged CUTPA claims that are not barred by the statute of limitations.  Opp. p. 96-114.

### i.   Defendant's Motion to Strike

This Court finds that: (1) the motion to strike is procedurally proper; (2) CUTPA does not allow for national class actions; and (3) Rule 23 does not supersede the class restrictions in CUTPA.

### 1.   Procedural Posture

Rule 12(f) provides that a "court may strike from a pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter."  Fed. R. Civ. P. 12(f).  Motions to strike "are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation."  *Schramm v. Kirschell*, 84 F.R.D. 294, 299 (D. Conn. 1979). Allegations are immaterial if they have "no essential or important relationship to

48

the claim for relief or the defenses being pleaded." *Mahon v. Chicago Title Ins. Co.*, No. 3:09cv690(AWT), 2009 WL 4268372, at *1 (D. Conn. Nov. 24, 2009) (citations and internal quotation marks omitted); *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

Rules 23(a) and 23(b) provide the procedural bases for determining the appropriateness of class certification.  *See* Fed. R. Civ. P. 23(a)-(b).  Rule 23(a) lists the prerequisites of numerosity, commonality, typicality, and adequacy of representation.  Fed. R. Civ. P. 23(a).  Rule 23(b) indicates that a "class action may be maintained if Rule 23(a) is satisfied and if" either: (1) separate actions would create a risk of inconsistent adjudications or adjudications that would impair the interests of other nonparty class members; (2) "the party opposing the class has acted or refused to act on grounds that apply generally to the class;" or (3) "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b).

In *Rogers v. Capital One Servs., LLC*, this Court articulated the standard for striking class allegations prior to a motion for certification.

> A court may grant a motion to strike and order deletion of portions of a complaint's class claims where the basis for the motion to strike is distinct from the issues that would be decided in connection with determining the appropriateness of class certification under Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure and it is clear that plaintiffs cannot possibly prove the deleted portions of those claims.

49

*Rogers v. Capital One Servs., LLC*, No. 10-CV-398(VLB), 2011 WL 873312, at \*7 (D. Conn. Feb. 19, 2011), *aff'd*, 447 F. App'x 246 (2d Cir. 2011) (quoting *Rahman v. Smith & Wollensky Rest. Grp.*, No. 06 Civ. 6198(LAK)(JCF), 2008 WL 161230, at \*3 (S.D.N.Y. Jan. 16, 2008)).

In *Rogers*, this Court denied a motion to strike class allegations where the defendants argued that "the proposed class could not be certified" because individual questions would predominate over common issues of law, and "the predominance criterion is a Rule 23(b) requirement, and therefore is not a proper basis for a motion to strike class allegations." *Rogers*, 2011 WL 873312, at \*9.

In *Rahman*, on the other hand, the court granted a motion to strike class allegations because the issue of "the extent to which the claims of absent members of the putative class have been exhausted" was "separate and apart from the issues that [would] be decided on a class certification motion." *Rahman*, 2008 WL 161230, at \*3.

In this case, the Defendants' main challenge to the class allegations in the Complaint is that "CUTPA explicitly precludes individuals who do not reside in Connecticut from bringing claims on behalf of a class." MTD p. 32. This alleged bar to the class proceeding, therefore, is a statutory restriction unrelated to the issues to be addressed at the class certification stage, i.e. those listed in Rules 23(a) and 23(b). Furthermore, the availability for a foreign named plaintiff to represent a class under CUTPA is a matter of law and can be determined on the facts of the Complaint. Therefore, this Court need not wait until a motion for class certification to strike class allegations on this basis.

50

In support of their argument that striking class allegations is procedurally improper at this stage, the plaintiffs cite *Chenensky v. N.Y. Life Ins. Co.*, in which the court stated that a "motion to strike class allegations . . . is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects . . . before plaintiffs are permitted to complete [] discovery . . . on questions relevant to class certification." *Chenensky v. N.Y. Life Ins. Co.*, No. 07 CIV. 11504(WHP), 2011 WL 1795305, at *1 (S.D.N.Y. Apr. 27, 2011) (quoting *Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 404 (W.D.N.Y. 2010)). However, the issues raised in the defendant's motion to strike in *Chenensky* were that "individual issues predominate; the class lacks commonality and typicality; and [the plaintiff was] not an adequate class representative." *Id.* at *2.  All of these issues fall under the Federal Rules of Civil Procedure 23(a) and 23(b) analysis, and, as described above, would more properly be decided on a class certification motion. The Defendants here do not allege any issues that would be determined under a Rule 23(a) and (b) analysis.

For those reasons, the Court views the motion to strike as procedurally proper at this stage of the litigation.

## 2.  CUTPA's Class Action Restriction

CUTPA creates both individual and class causes of action.  The statute provides:

> (a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business,

> to recover actual damages. **Proof of public interest or public injury shall not be required in any action brought under this section.  The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper.**

**Conn. Gen. Stat. § 42-110g(a).  That section confers a right of action to an individual plaintiff harmed by unfair or deceptive trade practices to bring an action in Connecticut.  Subsection (b) of that section limits that right of a person to bring a class action by stating that:**

> **Persons entitled to bring an action under subsection (a) of this section may, pursuant to rules established by the judges of the Superior Court, bring a class action on behalf of themselves and other persons similarly situated who are residents of this state or injured in this state to recover damages.**

**Conn. Gen. Stat. § 42-110g(b).  The statute permits any person authorized to bring a CUTPA action on their own behalf to bring a class action only on behalf of similarly situated residents of Connecticut or those that were injured in Connecticut.**

**The Defendants argue that the Court should strike the Plaintiffs national class action claims under CUTPA because the Plaintiffs "who do not reside in Connecticut and were not injured in Connecticut" are explicitly precluded from "bringing claims on behalf of a class."  MTD p. 32.  The Plaintiffs urge the Court to read the statute to permit a class action to be brought on behalf of persons who do not reside in Connecticut and who were not injured in Connecticut.  The Plaintiffs do not argue that the language is ambiguous, but rather argue on public policy grounds that, although they are not residents and were not injured in Connecticut, they should be allowed to bring a class action suit under CUTPA**

because there is a sufficient nexus to Connecticut: (1) the Plaintiffs allege that the headquarters of both Trilegiant and Affinion are located in Norwalk, Connecticut;" and (2) "from this headquarters, Trilegiant and Affinion designed and implemented their data pass scheme, intercepted consumers' billing information, and initiated unauthorized charges against consumers' accounts." Opp. p. 99.

"The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes.  If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." Conn. Gen. Stat. § 1-2z.  Furthermore, it is incumbent upon a party seeking an interpretation of a statute in variance with its apparently plain meaning to identify some ambiguity in the language itself, some ambiguity in the statute's context, or something in the legislative history of the statute suggesting the interpretation it espouses.  *F.D.I.C. v. Calderallo,* 79 Conn. App. 384, 394-96 (2003).  In any event, Courts are obliged to construe statutes in a manner which effectuates the legislative intent.  *Lauer v. Zoning Comm'n,* 220 Conn. 455, 459–60 (1991).  "A court should accord a statutory enactment its plain meaning" when its apparent meaning is not called into question as it was in *Courchesne.  State v. Jimenez,* 228 Conn. 335, 341 (1994); *Kilpatrick v. Bd. of Educ. of Town of Fairfield,* 206 Conn. 25, 28 (1988).

The Plaintiffs offer no alternative interpretation of the language of the statute, and no other legislative history or contextual support for the

interpretation they advocate.  Instead, they challenge the wisdom of the language and assert that because there is a nexus to the state the legislature should have allowed Connecticut residents to bring class actions on behalf of nonresidents. In essence, the Plaintiffs ask this Court to supplant its judgment for that of the legislature rather than to interpret the legislature's intent.  That is not the role of a Court.  Were the Court to conduct the standard statutory analysis, it would find that the language clearly and unambiguously does not permit a class action to be brought on behalf of non-residents or on behalf of those not injured in Connecticut, and that the language expresses the deliberate legislative intent that such suits not be permitted, as reflected in the legislative history discussed *infra*.

Further, a court in this district has held that a "foreign person suffering ascertainable loss outside of Connecticut from unlawful conduct occurring inside the state may initiate an individual action in Connecticut, but may not bring a class action because such plaintiff could not be representative of class members with the statutorily required in-state residency or injury characteristics." *Metro. Enter. Corp. v. United Techs. Int'l, Corp., Pratt & Whitney Large Commercial Engines Div.*, No. 3:03CV1685(JBA), 2004 WL 1497545 (D. Conn. June 28, 2004). In *Metro. Enter. Corp.*, the court denied a motion to dismiss an individual CUTPA claim by a nonresident injured outside of Connecticut while indicating that the nonresident plaintiff could not have brought a class action suit.  *See also Macomber v. Travelers Prop. & Cas. Corp.*, 277 Conn. 617, 624 (Conn. 2006) ("It is possible that this provision bars a national class action for CUTPA violations, such as this case.").

In this case, none of the named Plaintiffs are Connecticut residents, and none of the Plaintiffs were injured in Connecticut.  Therefore, the terms of CUTPA and the state's jurisprudence prohibit the Plaintiffs from bringing a class action on behalf of a national class.

### 3.  CUTPA and Rule 23

The Plaintiffs next argue that even if the terms of CUTPA would bar their national class, Rule 23 supersedes CUTPA's class action restriction.  Opp. p. 100-102.  This Court disagrees.

#### a.  Rule 23 Trumps Rules of Procedure

The Rules Enabling Act, which grants the Supreme Court the power to promulgate the Federal Rules of Civil Procedure, stipulates that "[s]uch rules shall not abridge, enlarge or modify any substantive right."  28 U.S.C. § 2072(b).

As described above, Rule 23(a) and 23(b) list criteria for maintaining a class action suit in federal court.  In *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, the Supreme Court addressed a conflict between Rule 23 and a procedural New York State statute that precluded any claim with the ability to recover a "penalty" from proceeding as a class action.  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 397 (2010).  A plurality agreed that since Rule 23 is procedural, it should trump a conflicting state procedural statute.  *Id.* at 398.  According to the plurality, the only test of a Rule's validity under the Rules Enabling Act is "whether it regulates procedure," and it found that Rule 23 did.  *Id.* at 410.

Justice Stevens clarified the meaning of the plurality opinion in a concurring opinion in which he explained that Rule 23 controlled only if the conflicting state law was also procedural, and he concluded that the New York statute in question was procedural. *Id.* at 436. He held, furthermore, that Rule 23 could not supersede substantive rights created by state law, including "rules that one might describe as 'procedural,' but . . . nonetheless define substantive rights." *Id.* at 425 n.8. He found that the New York law was not a substantive rule disguised as a procedural one because there were competing legislative explanations, at least one substantive and one procedural, and "[i]n order to displace a federal rule, there must be more than just a possibility that the state rule is" substantive. *Id.* at 436.

Even though the Second Circuit has yet to directly address which opinion is controlling, several other courts have concluded that Justice Stevens's concurring opinion is controlling when analyzing class action restrictions because it was decided on the narrowest grounds. *Leonard v. Abbott Labs.*, Inc., No. 10-CV-4676(ADS)(WDW), 2012 WL 764199, at *12 (E.D.N.Y. Mar. 5, 2012) ("In contrast to the plurality opinion that categorically held that Rule 23 complied with the Rules Enabling Act, Justice Stevens agreed with the four justice dissent 'that there are some state procedural rules that federal courts must apply in diversity cases because they function as a part of the State's definition of substantive rights and remedies.'") (quoting *Shady Grove*, 130 S. Ct. at 1448); s*ee also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 415 (S.D.N.Y. 2011) ("Justice Stevens' approach does, however, form the 'narrowest grounds' in *Shady Grove* .

. . [T]he five justices in the concurrence and the dissent concluded that the validity of Federal Rules of Civil Procedure turns, in part, on the rights afforded by the state rule that the Federal Rule displaces.") (quoting *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 675 (E.D. Pa. 2010)); *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir. 2011) ("Justice Stevens concurred, and the Tenth Circuit has understood his concurrence to be the controlling opinion in Shady Grove.") (citing *Garman v. Campbell Cnty. Sch. Dist. No. 1*, 630 F.3d 977, 983 n. 6 (10th Cir. 2010)); *Godin v. Schencks*, 629 F.3d 79, 84 (1st  Cir. 2010) (relying on Justice Stevens's concurrence in holding that "[b]ecause Section 556 is 'so intertwined with a state right or remedy that it functions to define the scope of the state-created right,' it cannot be displaced by Rule 12(b)(6) or Rule 56."); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 660 (E.D. Mich. 2011) ("Courts interpreting the Shady Grove decision . . . have concluded that Justice Stevens' concurrence is the controlling opinion by which interpreting courts are bound."); *Jones v. Corr. Med. Servs., Inc.*, 845 F. Supp. 2d 824, 853 (W.D. Mich. 2012) ("As such, Justice Stevens's opinion should be deemed controlling here too, until the Supreme Court can further clarify the issue."); *Williams v. Chesapeake La., Inc.*, No. 10-1906, 2013 WL 951251, at *4 (W.D. La. March 11, 2013) ("This Court agrees that Justice Stevens reached the same result as the plurality through a narrower ground. . . . Thus, this Court will follow the standard set out in the concurrence."); *Bearden v. Honeywell Int'l, Inc.*, No. 09–CV–1035, 2010 WL 3239285, at *10 (M.D. Tenn. Aug. 16, 2010) ("Justice Stevens's concurrence is the controlling opinion"); *Kline v. Mortg. Elec. Sec.*

*Sys.*, No. 08–CV–408, 2010 WL 6298271, at *3 (S.D. Ohio 2010) (noting that the district courts in Ohio faced with this precise issue "have concluded unanimously 'that Justice Stevens' concurrence . . . is the controlling opinion by which [they are] bound.'") (quoting *McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733 (N.D. Ohio 2010)); *Driscoll v. George Wash. Univ.*, No. 12-0690(ESH), 2012 WL 3900716, at *6 n. 5 (D.D.C. Sept. 10, 2012) ("Justice Scalia's opinion for the plurality in *Shady Grove* controls at the 'first step' of the *Shady Grove* analysis. . . . However, because Justice Stevens's concurrence sets forth a narrower ground as to the second step of the *Shady Grove* analysis than does Justice Scalia's opinion, . . . this Court agrees . . . that Justice Stevens's concurrence controls for that step."). *But see 3M Co. v. Butler*, 842 F. Supp. 2d 85, n. 7 (D.C. Cir. 2012) (finding that the majority opinion on the first step of the *Shady Grove* analysis controls); *In re OnStar Contract Litig.*, 2:07-MDL-01867, 2010 WL 3516691, at *4 (E.D. Mich. Aug. 25, 2010) ("conclud[ing] that the [Michigan Consumer Protection Act's] limitation on class actions conflicts with Rule 23 of the Federal Rules of Civil Procedure and therefore does not prevent non-residents from pursuing class-action claims under the MCPA in this action").  Other courts only apply the *Shady Grove* analysis when the state law at issue is procedural, thereby interpreting the majority opinion to only apply when the law at issue is procedural not substantive.  *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, No. 12-MD-2413(RRM)(RLM), 2013 WL 4647512, at *18 (E.D.N.Y. Aug. 29, 2013) ("The provision of New York state law at issue in *Shady Grove* was a procedural, not substantive rule—like Rule 23, a precondition[] for maintaining a class action.")

58

To help make sense of the fractured decision, it appears that several courts, either implicitly or explicitly, bifurcate the *Shady Grove* analysis into two steps.  The first step is governed by Justice Scalia's plurality opinion and requires a determination of whether the rule in question is procedural.  If it is found to be procedural, then courts use Justice Stevens's concurrence to analyze whether the Rule trumps the state statute at issue by determining whether the state statute is procedural or substantive.  This method takes into account that five Justices, Justice Stevens and the four dissenting Justices, agreed that a Federal Rule cannot alter substantive rights under state law and disagreed with Justice Scalia's broader holding that the Rules superseded both substantive and procedural state laws.  The Court is persuaded by this synthesis.

Accordingly, the first step is to "determine whether Rule 23 answers the question in dispute," and is, therefore, procedural.  *Shady Grove Orthopedic Assocs., P.A.*, 559 U.S. at 398-399.  It is clear that Rule 23 would permit a non-Connecticut resident to serve as a named plaintiff of a class action, and the Supreme Court has already determined the rule to be procedural.  The next step in the analysis is determining whether CUTPA's class action restriction is procedural or substantive.  Keeping in mind that all procedural rules will have some affect on substantive rights, the Court must determine if the restriction is only procedural, and thus trumped by Rule 23, or if is substantive such that applying Rule 23 would "abridge, enlarge, or modify a [] substantive right" conferred by CUTPA, so CUTPA's class action prohibition must be enforced.  28 U.S.C. § 2072(b).

### b.  CUTPA is Substantive

While the Second Circuit has yet to provide authority as to whether the restrictions in CUTPA are substantive or procedural, other courts have determined similar statutes to be substantive.  For example, in *In re Wellbutrin XL Antitrust Litig.*, the court found that a restriction in the Illinois Antitrust Act ("IAA") on actions by indirect purchasers was "intertwined with Illinois substantive rights and remedies because (1) the restrictions apply only to the IAA, (2) they are incorporated in the same statutory provision as the underlying right, not a separate procedural rule, and (3) the restrictions appear to reflect a policy judgment about managing the danger of duplicative recoveries."  *In re Wellbutrin XL Antitrust Litig.,* 756 F. Supp. 2d 670, 677 (E.D. Pa. 2010); s*ee also Phillips v. Philip Morris Cos. Inc.*, 290 F.R.D 476, 481 (N.D. Ohio 2013) ("The fact that [a class action restriction] is limited to actions under [Ohio's Consumer Sales Practices Act] suggests that it was not merely intended by the state legislature to function as a procedural rule to govern class actions.  Moreover, the fact that this limitation is contained within the very statute that provides consumers with an avenue for relief from unfair sales practices demonstrates that it impacts substantive rights.").

In the case of CUTPA, the class action restriction satisfies the three *Wellbutrin* factors: (1) the class action restriction only applies to CUTPA, and nationwide class actions are still possible under other causes of action (including unjust enrichment discussed *infra*); (2) the restriction is incorporated in the same provision – and in fact in the same sentence – as that which grants the right for

60

residents and those injured in Connecticut to bring a class action; and (3) there is
at least some evidence to suggest that the decision to restrict class actions to
Connecticut residents was a purposeful policy decision.

   While the first and second elements are evident from the statute itself, the
third requires some examination of the statute's legislative history.  CUTPA's
prohibition states that "[p]ersons entitled to bring an action under subsection (a)
of this section may . . . bring a *class action* on behalf of themselves and other
persons similarly situated *who are residents of this state or injured in this state* to
recover damages." Conn. Gen. Stat. § 42-110g(b) (emphasis added).  An earlier
draft of CUTPA simply read: "Persons entitled to bring an action under
subsection (a) of this statute may . . . bring an action on behalf of themselves and
other similarly situated persons to recover damages." H.B. 1965, 1973 Gen.
Assemb., Jan. Sess. § 7(b) (Conn. 1973) (LCO No. 6719).

   While debating CUTPA, The Connecticut General Assembly's Joint
Legislative Committee on General Law heard testimony from a representative of
the Connecticut Retail Merchants Association.  The Association recommended
that "the bill should be limited to activities within the State," and that the bill
should not permit class actions, which the Association's representative
described as "magnify[ing] virtually every alleged grievance a thousand fold and
perhaps a million fold, depending upon how broadly [a plaintiff] construes his
own class."  *An Act Concerning Unfair Trade Practices: Hearing on H.B. 1965*
*Before the J. Legis. Comm. On Gen. Law*, 1973 Gen. Assemb., Jan. Sess., at 716-
17 (Conn. 1973) (Statement of Nancy Buck, Counsel, Conn. Retail Merch. Ass'n)

(the committee members did not comment on this part of her testimony).  Even though the Court cannot determine the effect that this testimony had on the legislature, it is highly relevant to the present inquiry that a former draft of CUTPA did not contain the class action restriction that was ultimately added to the statute after such testimony was given.  From this history, it appears that the legislature meant to restrict the amount of potential litigation to which its companies could be subject.  This restriction, therefore, was not meant to be procedural, but was meant to have a substantive effect on the ability to bring a class action under CUTPA by denying that right to a subset of plaintiffs.

On the whole, this Court finds that the class action restriction in CUTPA reflects a substantive policy judgment by the Connecticut legislature.  Because the restriction is substantive rather than procedural, Rule 23 cannot supersede it. Therefore, the motion to strike the CUTPA nationwide class action allegations is GRANTED.

### ii.  Substantive CUTPA Claim

The Trilegiant and E-Merchant Defendants also argue that (1) the Plaintiffs have not maintained a claim for a substantive CUTPA violation because they failed to plead with sufficient particularity allegations of fraud as required by Rule 9(b); and (2) that several of the CUTPA claims are barred by the relevant statute of limitations.  MTD p. 33-34.

### 1.  Pleading Sufficient Particularity

In response to the Defendant's argument that the Plaintiffs have not pled sufficient particularity to maintain a CUTPA claim, the Plaintiffs state that they need not comply with Rule 9(b)'s heightened  pleading requirements because they allege violations of CUTPA based on unfair and deceptive acts and practices in addition to their general fraud claims.  Opp. 105-107.  In the alternative, the Plaintiffs claim that their fraud-based allegations have the requisite particularity so as to comply with Rule 9(b).  Opp. 107-109.

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  "[T]o prevail on a CUTPA claim, the plaintiffs must prove that (1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce . . . and [the plaintiff suffered] ascertainable loss of money or property as a result of the defendant's acts or practices."  *Neighborhood Builders, Inc. v. Town of Madison*, 294 Conn. 651, 657 (2010) (quoting Conn. Gen. Stat. § 42–110b(a); Conn. Gen. Stat. § 42–110g(a)).

> It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is

> immoral, unethical, oppressive, or unscrupulous; (3)
> whether it causes substantial injury to consumers
> [competitors or other businessmen].

*ZeeBaaS, LLC v. Kowlewyn*, No. 3:11cv11(VLB), 2012 WL 2327693, at *6 (D. Conn.
June 19, 2012) (citations and internal quotation marks omitted).  "All three criteria
do not need to be satisfied to support a finding of unfairness.  A practice may be
unfair because of the degree to which it meets one of the criteria or because to a
lesser extent it meets all three. . . . Thus a violation of CUTPA may be established
by showing either an actual deceptive practice or a practice amounting to a
violation of public policy."  *Id.* (citations and internal quotation marks omitted).

It is also "well established that CUTPA claims need not contain the
elements of fraud."  *Tatum v. Oberg*, 650 F. Supp. 2d 185, 195 (D. Conn. 2009).
And "[o]nly where allegations of fraudulent conduct form a necessary foundation
for a claim must a plaintiff abide by the heightened standard of Rule 9(b)."  *Milo v.
Galante*, No. 3:09cv1389(JBA), 2011 WL 1214769, at *8 (D. Conn. March 28, 2011);
*see also Fed. Paper Bd. Co., Inc. v. Amata*, 693 F. Supp. 1376, 1390 (D. Conn.
1988).  The Plaintiffs, therefore, must only comply with the pleading requirements
of Rule 8(a) when not alleging fraud as the basis for their CUTPA claim.  *See
Bruce v. Home Depot, U.S.A., Inc.*, 308 F. Supp. 2d 72, 77 (D. Conn. 2004); *Ho v.
Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 562 (S.D.N.Y. 2012).

The Court holds that to the extent the Plaintiffs have alleged a CUTPA
action based on fraud, they have failed to sufficiently plead with the particularity
required in Rule 9(b) for the same reasons discussed *supra*.  To the extent that
their claims are not based on fraud, the Court must examine those claims under

the standard of Rule 8.  Fed. R. Civ. P. 8(a);  *see* CAC at ¶¶ 22, 71, 205, 206, 209, 210, 216.

The Plaintiffs allege that the Defendants violated CUTPA by engaging in "unfair and deceptive act[s] and practice[s]."  CAC at ¶ 205.  In supporting these claims, the Plaintiffs allege that the Trilegiant Defendants employed several business and marketing tactics in a deceptive or unfair manner with the aid of the E-Merchant Defendants and the Credit Card Defendants.  CAC at  ¶¶ 4-6, 8-14, 74, 117.  These practices include sharing confidential billing information through datapass, employing negative option billing, and making it difficult for consumers to get refunds through the refund mitigation policy.  CAC at ¶¶ 7, 81-87.

The Plaintiffs describe datapass as the transaction that occurs when confidential billing information is sent to Trilegiant to facilitate further purchases because the customer is not required to reenter credit card or debit account information.  CAC at ¶¶ 7(a), 75-80.  Negative option billing is the billing practice in which members are automatically charged a monthly membership fee until they affirmatively cancel their membership.  CAC at ¶ 81.  The Complaint fails to explain how either of these business practices are unfair or deceptive.  In fact, it concedes that the negative option billing practice was disclosed in fine print on Trilegiant's offer page.  *Id.*  Datapass, moreover, is not in and of itself an unfair practice, but like all marketing tactics can be used unfairly.  Datapass can be used in a fair manner to help consumers efficiently complete several online purchases.  Conversely, the Plaintiffs here have not alleged how datapass was used in an unfair or deceptive manner towards them.  For example, had the

65

Plaintiffs alleged that datapass was used to transfer private billing information to Trilegiant who then charged for products never advertised, it may have been an unfair or deceptive use of the tool, but the Plaintiffs fail to make such allegations. By pleading only nebulous facts and inferences, the Plaintiffs have only provided conclusory allegations and have not sustained their burden on a motion to dismiss. *See ZeeBaaS, LLC*, 2012 WL 2327693, at *7 (conclusory allegations are insufficient to plead a CUTPA claim for unfair or deceptive practices).

The Plaintiffs have, however, made allegations sufficient to show that the refund mitigation strategy adopted by Trilegiant could have violated CUTPA.  The Plaintiffs claim that call-center employees were "specifically instructed to tell customers that they somehow signed up for the Membership Programs through their credit card company," instead of telling them the truth about their membership enrollment.  CAC at ¶ 86.  The Plaintiffs prove that this strategy was implemented by referencing an email in which a representative from 1-800 Flowers told a representative from Trilegiant that "we have had increasingly more frequent feedback from our own teams that your agents are telling our customers to call us" when the customer calls Trilegiant to cancel their membership.  CAC at ¶ 133.  Assuming these allegations to be true, call-center employees were directed to and did deceive customers calling to cancel their memberships.  This misdirection would undoubtedly permit Trilegiant to charge more monthly fees while the customer attempted to discover how to cancel its membership.  This claim, therefore, is actionable under CUTPA.

Accordingly, the Defendants' motion to dismiss the individual substantive CUTPA claims is DENIED as to the refund mitigation strategy, but for all other substantive CUTPA claims it is GRANTED.

### 2. CUTPA Statute of Limitations

The Defendants argue that several of the Plaintiffs' CUTPA claims are time-barred because some of the Plaintiffs enrolled in "membership programs more than three years before filing their complaints."  MTD p. 35.  The Plaintiffs respond by stating that they suffered recurring injuries in the form of unauthorized monthly charges, thereby tolling the statute of limitations.  Opp. p. 109.  At the very least, the Plaintiffs argue that they should be able to recover for the charges that occurred within the limitations period.  *Id.* p. 110.  In the alternative, the Plaintiffs claim that the Defendants engaged in fraudulent concealment and a continuing course of conduct, both of which would toll CUTPA's statute of limitations.  *Id.* p. 110-14.

CUTPA is governed by a three-year statute of limitations.  Conn. Gen. Stat. § 42-110g(f).  It also is an occurrence statute, "meaning that the time period within which a plaintiff must commence an action begins to run at the moment the act or omission complained of occurs." *Breiner v. Stone*, 122 F.3d 1055, 1055 (2d Cir. 1997) (citations and internal quotation marks omitted).  CUTPA is not a discovery statute, meaning that a plaintiff does not even need to have constructive knowledge of the violation for the limitations period to run.  *See Argus Research Grp., Inc. v. Argus Media, Inc.*, 562 F. Supp. 2d 260, 279-80 (D. Conn. 2008)

(finding that CUTPA is not a discovery statute, so constructive knowledge is not relevant).  It is important to note that the limitations period begins to run not from the occurrence of the injury, but from the occurrence of the alleged violation.  *See Phelan ex rel. Estate of Phelan v. Daimler Chrysler Corp.*, 323 F. Supp. 2d 335, 338 (D. Conn. 2004) ("July 9 is the end point of any possible deceptive act by DCC related to inducing purchase of the jeep by Phelan's decedent and, as such, the final date of a CUTPA violation from which the statute of limitations begins to run."); *Johnson v. Walden Univ., Inc.*, 839 F. Supp. 2d 518, 525-26 (D. Conn. 2011) ("The acts or omissions Johnson complains of are statements made to him by his Faculty Mentor, Dr. Anderson, and representations made by Walden in its materials describing the Program, which statements and representations he alleges led him to believe he could become a practicing psychologist upon completion of the Walden Program.").

The Plaintiffs have alleged that several of the Defendants' business practices were unfair, deceptive, or fraudulent, and, therefore, violated CUTPA. These practices can be sorted into two groups: (1) those practices related to the alleged fraudulent enrollment into a membership program; and (2) those practices that occurred after the Plaintiffs discovered their enrollment.  The first group is comprised of the sharing of confidential billing information via datapass and through the nondisclosure of the negative option billing practice.  The second group is composed of the marketing or sales tactics alleged to be used in the refund mitigation strategy.  The Court must determine the latest possible date of the deceptive practices and start calculating the limitation period from those

points.  Assuming that the first group was not already dismissed for insufficient

pleading, the first group of alleged unfair or fraudulent business practices was

completed, at the latest, by the time the first or second membership fee was

posted.  Plaintiff Reilly alleged that the membership fee charges began shortly

after May 2007; Plaintiff Restrepo alleged that the membership fee charges began

on May 9, 2007; Plaintiff Warfel alleged that the membership fee charges began

shortly after December 2004; and Plaintiff Williams alleged that the membership

fee charges began shortly after May 26, 2009. CAC ¶¶ 27, 28, 33, 34.  The first

complaint for Plaintiff Reilly was dated March 2012, for Plaintiff Restrepo it was

dated July 13, 2011, for Plaintiff Warfel it was dated August 4, 2011, and for

Plaintiff Williams it was dated September 2012.  [Dkt. 250, Defendants' Reply

Memorandum in Support of their Motion to Dismiss Plaintiffs' Consolidated

Amended Complaint or, in the Alternative, to Strike Portions of the Complaint, p.

26-27, hereinafter "Reply"].  All of these complaints were filed more than three

years after the alleged violations of CUTPA from the first group of practices.

Therefore, these claims would be untimely.

However, it is undisputed that the refund mitigation strategy began only

after the Plaintiffs discovered the charges and called Trilegiant either to cancel

their membership or to request a refund.  The Plaintiffs allege that they only

discovered the charges and contacted Trilegiant within three years of filing their

CUTPA claims.  Those claims, therefore, are timely.

The Plaintiffs ask this Court to find that the continued injury of monthly

membership fees tolls the statute of limitations, or, in the alternative, that they

can recover for damages that occurred within the three year statute of limitations period. The Plaintiffs have failed, however, to allege sufficiently how charging a recurring monthly membership fee that is clearly listed on credit card statements or other banking information violates CUTPA. Moreover, these actions only constitute, at most, a repeating injury, not a recurring violation. The Plaintiffs rely on *Broadway Theatre Corp. v. Buena Vista Pictures Distrib.*, to argue that their recurring injury should toll the statute of limitations. In *Broadway Theatre Corp.*, the court found that the repeated issuances of exclusive distribution licenses to a movie theater created new and independent injuries because each license was a violation of CUTPA. *Broadway Theatre Corp. v. Buena Vista Pictures Distrib.*, No. 3:00cv706(SR.), 2002 WL 32502100, at *6 (D. Conn. Sept. 19, 2002). Unlike in that case, repeated injury, in the form of recurring monthly charges, does not constitute new and independent CUTPA violations, especially when no further unfair or fraudulent activities are alleged to have occurred between the enrollment date and the discovery of the enrollment. Indeed, the court in *Broadway Theater Corp.* did not find that the theatre's recurring injury would toll the statute of limitations; it found that the issuance of new distribution licenses constituted violations of CUTPA such that each issuance would have its own three year statute of limitations period. *Id.* Moreover, the Court held that the plaintiffs "potential damages are limited to harm suffered as a result of actions taken by the Distributors within the three-year statutory period." *Id.* Following that logic, the Plaintiffs are not able to claim damages caused by CUTPA violations that occurred more than three years ago even if the harm occurred

within three years of the complaint.  Since the Plaintiffs here allege that the
datapass and failure to disclose the negative option billing practice occurred
more than three years ago, any damages resulting from those injuries are no
longer compensable.

The Plaintiffs next argue that the Defendants have engaged in fraudulent
concealment, thus tolling the statute of limitations.  Under the doctrine of
fraudulent concealment "equitable tolling of the statute of limitations is permitted
until the fraud or concealment is, or should have been, discovered by a
reasonable person in the situation."  *Thompson v. Accent Capital*, No.
3:11CV00069(AWT), 2011 WL 3651848, at *3 (D. Conn. Aug. 18, 2011), *aff'd*, 491 F.
App'x 264 (2d Cir. 2012) (citations and internal quotation marks omitted).  Just as
when analyzing the RICO claim, this Court finds that the Plaintiffs had notice of
the alleged fraud when they received their credit card or debit account
statements.  So, no fraudulent concealment could exist past the date that the
Plaintiffs received their banking information, which, based a reasonable reading
of the Complaint, occurred the month after their enrollment in the Trilegiant
membership programs.  Furthermore, the Plaintiffs have not alleged how the
Defendants concealed their fraud because submitting financial statements to the
Plaintiffs actually revealed, not concealed the membership charges.

Finally, the Plaintiffs assert that the statute of limitations should be tolled
under the continuing course of conduct doctrine.  Even though the Connecticut
Supreme Court has yet to provide clear guidance on this issue, the Court need
not decide in these circumstances if the doctrine would toll the statute of

71

limitations.  *Flannery v. Singer Asset Finance Co., LLC*, 128 Conn. App. 507, 508 (Conn. App. 2011), *cert. granted*, 302 Conn. 902 (2011).  The Connecticut Supreme Court has applied the doctrine to cases where "there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act."  *Giulietti v. Giulietti*, 65 Conn. App. 813, 834 (2001).

In *Phelan ex rel. Estate of Phelan v. Daimler Chrysler Corp.*, the court held that the continuing course of conduct doctrine does not apply in a vendor-vendee relationship if the plaintiff does not allege a continued pattern of deceitful conduct after the initial fraud because a vendor is under no legal obligation to disclose his initial deceitful conduct.  *Phelan ex rel. Estate of Phelan*, 323 F. Supp. 2d at 339-40.  Similarly here, the vendor-vendee relationship that was created between the Plaintiffs and the Defendants did not require the Defendants to disclose their initial unfair or deceptive practices.  To toll the statute of limitations, the Plaintiffs need to allege a continued pattern of behavior showing that the Defendants continued to interact with the Plaintiffs in a manner perpetrating that initial fraud.  *Id.*  After the Plaintiffs were initially enrolled into the membership program, however, they were immediately put on notice of their enrollment and its recurring monthly fees.  The Plaintiffs have not alleged that the listed charges were themselves inaccurate or fraudulent.  Therefore, the Defendants did not continue in a course of conduct that concealed the existence of the alleged fraud or unfair practices, but actually acted in manner that would reveal them.

The Plaintiffs do allege, however, that when contacting Trilegiant, they experienced refund mitigation tactics, which may have resulted in a new CUTPA violation.  This later fraudulent or unfair act or acts is not sufficiently tied to concealment of the initial fraud to constitute a continuing course of conduct or serve as a basis for fraudulent concealment, given that the recurring charges were repeatedly disclosed to the Plaintiffs in the form of their bank statements. Since this Court has not characterized the refund mitigation strategy as being part of the same fraudulent or unfair scheme that resulted in the membership enrollment, but rather a second potential set of CUTPA violations, the Court separates these claims for statute of limitations purposes.  For that reason, damages related to the initial fraudulent inducement which occurred more than three years before the Complaint was filed would be time-barred, but those claims stemming from the potentially unfair or deceptive refund mitigation strategy tactics are timely.

For the foregoing reasons, Defendants' motion to dismiss the CUTPA claims as to plaintiffs Reilly, Restrepo, Warfel and Williams is DENIED as to claims stemming from the refund mitigation practices, but GRANTED as to all other claims.

### e.  Other States' Consumer Protection Statutes

The Defendants also move to dismiss or strike footnote 18 of the Complaint because it merely lists several other states' consumer protection statutes without explaining how those statutes relate to the Defendants' alleged conduct in this

case.  MTD p. 33, n.13.  In response, the Plaintiffs only allege that they are able to maintain causes of action under the various statutes in a class action proceeding, but they do not contest that they have only listed the statutes without explaining how they relate to the Defendants' conduct.  Opp. p. 104.

"Plaintiffs cannot use class actions to escape pleading requirements." *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 378-79 (E.D.N.Y. 2010).  Several courts have held that merely listing statutes that could provide possible causes of action without explaining even the broadest contours of how those statutes were violated "is insufficient to state a claim." *McGarvey v. Penske Auto Group, Inc.*, 639 F. Supp. 2d 450, 465-66 (D.N.J. 2009), *vacated on other grounds*, 2010 WL 1379967 (D.N.J. March 29. 2010); *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 378-79 (E.D.N.Y. 2010); *District 1199P Health & Welfare Plan v. Jansen L.P.*, 784 F. Supp. 2d 508, 531 (D.N.J. 2011) (merely listing consumer protection statutes as alternative causes of action does not meet the most basic pleading requirements).  Merely listing possible causes of action without providing a "short and plain statement of the claim" as it relates to these statutes, is not sufficient to sustain a motion to dismiss under Rule 8(a).  Fed. R. Civ. P. 8(a).

Here, the Plaintiffs have not incorporated any of the other state consumer protection statutes into their Complaint.  Furthermore, they have not attempted to explain how the Defendants' conduct fits into each of the undoubtedly varying elements of the statutory schemes.  Without tying the Defendants' alleged

conduct to violations of these statutes, the Plaintiffs have not sufficiently met the pleading requirements of Rule 8(a).  To the extent these statutes were alleged as being alternate causes of action in the Complaint, the Defendants' motion to dismiss is GRANTED.[7]  While recognizing that a party may plead in the alternative, the Court notes that claims based on desperate state statutory schemes militates against class action certification.

### f.   Claims for Violations of the Automatic Renewal Statute, California Business and Professional Code § 17602

The Trilegiant and E-Merchant Defendants allege that the Plaintiffs' cause of action under the Automatic Renewal Statute must be dismissed for several reasons: (1) the Plaintiffs do not allege any facts as to how the Defendants violated the automatic renewal provision; (2) the statute only applies to offers made to consumers in California; and (3) the claims of the Plaintiffs who do reside in California are not timely because the law at issue only went into effect on December 1, 2010.  MTD p. 36-37.  The Plaintiffs respond that (1) they have alleged sufficient facts to show that automatic renewals were made in violation of the statute; (2) that the statute covers all consumers regardless of location; and (3) that no initial orders prior to the statute's enactment were completed because the Plaintiffs never knowingly formed a contract with any of the Defendants related to the membership programs.  The Plaintiffs have sufficiently pled a

---

[7] Since the Defendants' motion to dismiss was granted, the motion to strike is moot, and the Court need not decide if it is appropriate to strike that portion of the Complaint.

violation of the statute, but the statute only prohibited conduct which occurred

after December 1, 2010 directed towards customers in California.

The Automatic Renewal Statute makes it

> unlawful for any business making an automatic renewal
> or continuous service offer to a consumer *in this state*
> to do any of the following: (1) Fail to present the
> automatic renewal offer terms or continuous service
> offer terms in a clear and conspicuous manner . . . (2)
> Charge the consumer's credit or debit card or the
> consumer's account with a third party for an automatic
> renewal or continuous service without first obtaining the
> consumer's affirmative consent to the agreement . . . or
> (3) Fail to provide an acknowledgement that includes the
> automatic renewal or continuous service offer terms,
> cancellation policy, and information regarding how to
> cancel . . . .

Cal. Bus. & Prof. Code § 17602(a) (emphasis added).  The requirements of this

statute "apply only prior to the completion of the initial order for the automatic

renewal or continuous service," with limited exceptions.  *Id.* At § 17602(d).  In

short, the section "prohibits a business from" "(a) failing to present the terms of

the offer in a clear and conspicuous manner, (b) charging the consumer's

account without first obtaining affirmative consent, and (c) failing to provide an

acknowledgment of the consumer's enrollment in the offer."  *Fields v. Wise

Media, LLC*, 12-cv-05160(WHA), 2013 WL 3187414, at *5 (N.D. Cal. June 21, 2013).

### i.  Sufficiency of Pleadings

The Plaintiffs have alleged that the Defendants were involved in enrolling

and charging the Plaintiffs for membership programs without their explicit

consent or knowledge.  CAC at ¶¶ 77-82.  They also alleged that the only

disclosure of the negative option billing practice was done in "exceedingly fine print."  CAC at ¶ 181.  Accepting these allegations as true, the Plaintiffs have sufficiently pled that Trilegiant's terms and conditions were not offered in "clear and conspicuous manner."  *See id.*  Therefore, the Plaintiffs have sufficiently alleged facts that could constitute a violation of the Automatic Renewal Statute.

### ii.  Location of Injured Party

The Defendants next claim that the statute only protects individuals who were injured in California.  Inexplicitly the Plaintiffs disagree.  Section 17602(a) states that it "shall be unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state," meaning California.  The only other court to have had occasion to address this issue found that the text of the statute clearly creates a cause of action only for consumers that are residents of or were harmed in California.  *See Noll v. eBay Inc.*, 11-cv-0485(EJD), 2013 WL 2384250, at *6 (N.D. Cal. May 30, 2013) (finding that the Automatic Renewal Statute provided a private right of action only for California residents).  In *Noll v. eBay Inc.*, the court found that the statute's plain language prohibited a Florida resident from bringing a claim for relief.  *Id.*  It noted that in other provisions in the same code, the legislature created causes of action for out-of-state customers, but chose not to include that right in this statute.  *Id.*  The court refused to "contravene the Legislature's clear intention" to limit the cause of action in this statute.  *Id.*

We agree that the Automatic Renewal Statute only provides a private cause of action for customers who are harmed in California.  Any holding to the contrary would clearly abrogate the statute's plain text and could have serious constitutional implications.  *See* Reply. p. 21, n.17.  Therefore, the claims arising under the Automatic Renewal Statute from the Plaintiffs who were harmed outside of California are DISMISSED.

### iii.  Date of Injury

The Defendants claim that the statute only protects consumers who were harmed after December 1, 2010.  MTD p. 36.  The Plaintiffs argue that they were harmed after December 1, 2010 because they did not consent to an "initial order" prior to that date.  Opp. p. 128-30.  Furthermore, they assert that the recurring credit card or debit account charges after December 1, 2010 cause the claims to be actionable.  *Id.*

The California legislature stated that "[t]his article shall become operative on December 1, 2010."  2009 Cal. Leg Serv. Ch. 350 (S.B. 340) (WEST) § 1; Cal. Bus. & Prof. Code § 17606.  The default rule of statutory construction is that statutes apply prospectively unless the legislature has manifested a clear intent to the contrary.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) ("But while the *constitutional* impediments to retroactive civil legislation are now modest, prospectivity remains the appropriate default rule.") (emphasis in original).  Here, the legislature manifested its intent for the statute's prospective application by explicitly setting its operative date without limitation or exception.

Therefore, for an injury to be cognizable under the statute, the violation must have occurred on and after December 1, 2010 because before this date, the statute was inactive.  Moreover, the Plaintiffs do not argue that the statute should apply retroactively.

Instead, the Plaintiffs argue that the violation occurred after December 1, 2010 because they failed to read their monthly statements and were therefore unaware that they were paying recurring monthly membership fees for Trilegiant's membership programs until they actually read their statements and discovered the recurring monthly charges.  The Plaintiffs' argument that they had no "initial order" as required by the statute because they did not consent to forming the initial contract is unavailing because they would no longer have standing to bring a cause of action under this statute.  Section 17602(d) states that a company must disclose the terms and conditions of the renewal obligation before "completion of the initial order."  Cal. Bus. & Policy Code § 17602(d).  This means that to violate the statute, companies must fail to disclose the automatic renewal practice before the first order is completed.  Therefore, if the Plaintiffs have not completed any "initial orders," the companies have not breached any obligations.

Contrary to both the Plaintiffs' and Defendants' arguments, section 17602(d) has no bearing on when the statute became effective; it only dictates when the companies offering the automatic renewal must comply with the statute's requirements.  After the initial order is complete, the company is not required to continue making the necessary disclosures except as provided by the

statute.  Considering the statute's affirmative obligations, to state a cause of action under this statute, a plaintiff must allege that he or she was enrolled in a membership program without being adequately notified of the automatic renewal provision after December 1, 2010.  Since all of the Plaintiffs allege becoming Trilegiant members before that date, the claims under this statute are not cognizable.  CAC at ¶¶ 24-34.

The Plaintiffs' argument that their continued injury in the form of monthly membership dues tolled the statute of limitations for this action is inapplicable. Because the statute was not in effect at the time the alleged violation occurred, there was no cause of action to toll.  Further, because the Court views the Plaintiffs as having no cause of action under the Automatic Renewal Statute, it does not decide whether continued injury tolls the relevant statute of limitations.

Defendants' motion to dismiss the Automatic Renewal Statute claims is GRANTED.

### g.  Claims for Unjust Enrichment

The Defendants move to dismiss the Plaintiffs' unjust enrichment claim because the Plaintiffs have not "plausibly pleaded any conduct that is 'fraudulent, deceptive [or] wrongful," and because "the CAC does not allege that Plaintiffs conferred any benefit on any Defendant except the Trilegiant Defendants."  MTD p. 37-38.  The Plaintiffs reply that they have pled with sufficient detail the unjust nature of the Defendants' actions and have alleged how each group of

Defendants has received some benefit from the unjust, fraudulent, or otherwise wrongful conduct.  Opp. p. 130-132.

Under Connecticut law, unjust enrichment is a "broad and flexible remedy," and plaintiffs seeking recovery under this theory "must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment."  *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (Conn. 2006) (citations and internal quotation marks omitted).  "This doctrine is based upon the principle that one should not be permitted unjustly to enrich himself at the expense of another but should be required to make restitution of or for property received, retained or appropriated . . . . The question is: Did [the party liable], to the detriment of someone else, obtain something of value to which [the party liable] was not entitled?"  *Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 451 (Conn. 2009) (citations and internal quotation marks omitted).

Under the liberal construction of the pleadings doctrine at the motion to dismiss stage, the Court finds that the Plaintiffs have sufficiently pled their unjust enrichment claim as to the Trilegiant and E-Merchant Defendants.

The alleged fraudulent, deceptive, or unfair business practices of the Defendants have been discussed at length, and do not require much repetition here.  In short, the Plaintiffs have alleged that the Defendants tricked them into enrolling into a membership program, and then would automatically charge them recurring membership fees; when the Plaintiffs finally discovered that they were

being charged, the Defendants would make it incredibly difficult for them to obtain a refund.  CAC at ¶¶ 24-35, 71-82.  As part of the refund mitigation strategy, the E-Merchant Defendants were heavily involved in organizing and implementing the tactics.  CAC at ¶¶ 8, 133.  The Plaintiffs further allege that as part of this process, Trilegiant paid the E-Merchant Defendants signing bonuses and "sizeable percentage[s]" of each dollar collected from the E-Merchant's customers.  CAC at ¶¶ 5, 6, 104, 119-133.  These allegations are sufficient under Rule 8(a) to sustain a claim for unjust enrichment against the Trilegiant and E-Merchant Defendants.  *See Keaney v. Eastern Computer Exch., Inc.*, No. 03-cv-1893(RNC), 2004 WL 885100, at *2 (D. Conn. April 21, 2004) (allegations in a complaint are liberally construed on a motion to dismiss, "all plaintiff need allege is that the individual defendants have benefited from his services to Eastern, and unjustly failed to pay him for the benefits, to his detriment."); *see also Jewell v. The Med. Protective Co.*, No. 03-cv-1157(RNC), 2003 WL 22682332, at *2 (D. Conn. Oct. 30, 2003).

However, the Plaintiffs have failed to allege sufficiently how the Credit Card Defendants were involved in the scheme or were unjustly enriched.  Indeed, the Plaintiffs admitted that "Trilegiant and Affinion conduct legitimate business of selling the Membership Programs through lawful means."  CAC at ¶ 154.  They then accuse the Credit Card Defendants of furthering the scheme by not refusing to process Trilegiant membership charges.  The Plaintiffs fail to allege, however, how the Credit Card Defendants could have known what members were willing participants in Trilegiant's membership programs and which members felt that

they were fraudulently enrolled.  The Plaintiffs' conclusory allegations that the numerous Credit Card Defendants knew that the charges were fraudulent because they had some type of unidentified anti-fraud program and they collectively received thousands of complaints by Trilegiant customers, without any indication of the order of magnitude of the complaints, are not sufficient.

Moreover, the Plaintiffs' conclusion that the Credit Card Defendants reviewed Trilegiant call-center scripts and participated in calls with customers seeking a refund does nothing more than explain that the Credit Card Defendants were taking their customer complaints seriously.  CAC at ¶ 11(b).  Furthermore, unlike the E-Merchant Defendants who received substantial bounties directly tied to every dollar that Trilegiant made, the Plaintiffs only allege that the Credit Card Defendants engaged in the ordinary course of business by processing charges at their standard processing fee rate for all of their customers, including Trilegiant. CAC at ¶ 12.  The Credit Card Defendants also never allegedly engaged in any acts to conceal the fraud as they were the Defendants who sent the Plaintiffs financial statements clearly indicating the membership charges.  CAC at ¶ 160(h). On these facts and conclusions alone, the Plaintiffs have not sufficiently shown how the Credit Card Defendants were involved in the alleged unjust behavior or how they were unjustly enriched.

For the foregoing reasons, the Defendants' motion to dismiss the Plaintiffs' unjust enrichment claims is DENIED as to the Trilegiant and E-Merchant Defendants and GRANTED as to the Credit Card Defendants.

### h. The *Pederson* Class Action Settlement

The Defendants argue that Plaintiffs Reilly, Restrepo, Brian Schnabel, and Warfel should be barred from bringing claims against the Defendants because they were included in a prior class action settlement in which they specifically released all claims against the Defendants for the activity alleged in this Complaint.  MTD p. 38-42.  The Plaintiffs respond by stating that they were not included in the prior class because their injuries extended outside of the prior class's temporal definition.  Opp. 134.  The Court disagrees with the Plaintiffs and finds that the Plaintiffs are barred from bringing their current claims because of the prior class action settlement.

At the outset, a court may "judicially notice prior pleadings, orders, judgments, and other items appearing in the court records of prior litigation that are related to the case before the Court."  *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144-145 (D. Conn. 2005); *see also Steinmetz v. Toyota Motor Credit Corp.*, 963 F. Supp. 1294, 1298-99 (E.D.N.Y. 1997) (judicial proceedings from state courts, including prior class action settlement agreements will have binding res judicata effect under the full faith and credit clause).  The Plaintiffs do not contest that the Court may take judicial notice of the *Pederson* Settlement Agreement or contest the binding nature of that prior agreement.

The definition of the Settlement Class in the *Pederson* litigation is incredibly broad, and includes "[a]ll persons and entities who had unsolicited or

unauthorized charges for Trilegiant products posted to their credit card, debit card, phone, bank, mortgage, or other billing accounts by Trilegiant or a Marketing Partner and who paid Trilegiant for those products at any time from July 10, 1998, until February 15, 2008." *See* Exhibit 4 to MTD, *Pederson v. Trilegiant*, No. 01-L-1126 (Ill. Cir. Ct. July 18, 2008).  The Plaintiffs contend that they are not members of this class because they were charged monthly fees after February 15, 2008.  This definition, however, clearly encompasses all people who had unsolicited or unauthorized charges prior to February 15, 2008 regardless of what happened after that date.  In the Complaint, Plaintiffs Reilly, Restrepo, Brian Schnabel, and Warfel all admitted that they had unauthorized charges for a Trilegiant membership program prior to February 15, 2008.  Accordingly, they are by definition class members in the *Pederson* proceeding.

The Class members agreed to release all claims against Trilegiant and other "released persons," which includes the E-Marketing Defendants and the Credit Card Defendants here, arising from "the marketing, sale and/or purchase of a Product or the provision of a Product by the released Persons, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated . . . ." *Id.* at ¶ 12.

The Plaintiffs do not allege, nor could they, that the matters at issue in this Complaint are not barred by the prior settlement.  Since the Plaintiffs named above are members of that former class, their claims must be dismissed.

The Plaintiffs hint at, but fail to argue, a possibly compelling due process argument related to the notice that the *Pederson* class members received or, more appropriately, failed to receive.  *See Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 221-26 (2d Cir. 2012) (reversing the district court's dismissal of a claim based on *res judicata* due to a settlement agreement because notice in one national newspaper did not comport was due process protections). Unfortunately, the Plaintiffs only state that "there is simply no evidentiary basis at this early stage" to conclude that they were given proper notice.  Opp. p. 134, n.80.  Even if they did not receive proper notice, the Court posits without deciding that it would appear that such a challenge should be brought before the court in which the class action settlement was approved.

The Defendants' motion to dismiss the claims of Plaintiffs Reilly, Restrepo, Brian Schnabel, and Warfel as being barred by the prior settlement agreement is GRANTED.

### i. Motion to Strike the Allegations Regarding Previous Investigations and Attorneys General Settlements

The Defendants move to strike the Plaintiffs' allegations regarding the Senate Report and settlements between the Trilegiant Defendants and state attorneys general because these allegations are immaterial to the case at hand. MTD, p. 42, 43.  The Defendants argue that since the Plaintiffs are only using these past reports and agreements to prove further the Defendants' liability in the present matter or to show liability in prior proceedings, the allegations violate the federal rules of evidence, and, therefore, will be inadmissible at trial.  *Id.*  The

Plaintiffs respond by stating that they are not using the Senate Report or the settlement agreements to prove liability in the present matter, but for other purposes permitted under the federal rules of evidence, such as to prove the Defendants' knowledge, motive, or notice.  Opp. p. 136.  These allegations are immaterial to the present proceeding and have no purpose remaining in the Complaint.

In "deciding whether to strike a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976).  "Evidentiary questions, such as the one present in this case, should especially be avoided at such a preliminary stage of the proceedings. . . . And ordinarily neither a district court nor an appellate court should decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone."  *Id.* (citing *Gleason v. Chain Service Restaurant*, 300 F. Supp. 1241 (S.D.N.Y. 1969), *aff'd*, 422 F.2d 342 (2d Cir. 1970)); *Fleischer v. A. A. P., Inc.*, 180 F. Supp. 717 (S.D.N.Y. 1959); 2A Moore's Federal Practice P 12-21(1) (2d ed. 1975)).  Nevertheless, "Second Circuit case law makes clear that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f) of the Federal Rules of Civil Procedure" in cases where they are being used "as substantive evidence of previous wrongdoing" or to prove liability.  *In re Merrill*

*Lynch & Co., Inc. Research Reports Securities Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003); *Dent v. U.S. Tennis Ass'n, Inc.*, No. 08-cv-1533, 2008 WL 2483288, at *2 (E.D.N.Y. June 17, 2008); *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011 ) (stating that plaintiffs were prohibited from relying on a CFTC order to plead the "underlying facts of liability" because it "was the product of a settlement between the CFTC and the Respondents, not an adjudication of the underlying issues in the CFTC proceeding.") (quoting *United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981)).

Initially, it is unclear to the Court how the prior settlement with the attorneys general is relevant to the present matter.  In that case, the resolution, as the Plaintiffs describe it, was that "Trilegiant was enjoined from directly marketing its Membership Programs through *mail* solicitations without making certain changes to its practice."  CAC at ¶ 6 (emphasis added).  The Plaintiffs also admitted that after that settlement, Trilegiant "mutated its business practices into *their current form.*"  CAC at ¶ 17 (emphasis added).  Furthermore, only Trilegiant and Chase were parties to those prior settlements.  Clearly, the Plaintiffs are not attempting to show that the past conduct is the same conduct at issue in this case.  Therefore, this Court does not find the discussion of those prior settlements as material to the present Complaint.

On the other hand, the Senate Report seems to discuss nearly identical commercial behavior that the Plaintiffs allege gives rise to their causes of action here.  The Report concluded "that the E-Merchant Defendants engaged in deceptive conduct and violated credit card company rules by automatically

transferring customer's credit card information to Trilegiant."  CAC at ¶ 16.

However, the Plaintiffs do not provide much detail explaining why the Senate

reached this conclusion.  Even so, it appears that the investigation's conclusions

were not derived from the adversarial process, but from a one-sided factual

inquiry.  While these reports are important for future legislation, they should have

no bearing on a Defendant's liability before a Court of law.  Moreover, the

excerpts that the Plaintiffs provide in the pleadings do not define Trilegiant's

marketing or banking partners.  So, it does not appear that the Plaintiffs intend to

use the report to show knowledge or notice.  The only purpose that the Court can

draw from the inclusion of these allegations in the Complaint is to show proof of

the Defendants' liability either for past activities of prior bad acts or for activities

identical to the claims alleged here.

Since the purpose of the pleadings is to put the Defendants on notice as to

how they violated the necessary elements of the causes of action stated by the

Plaintiffs and because facts related to unadjudicated investigations or

settlements are not permitted to prove liability, the Senate Report and the

settlement by the states' attorneys general are immaterial and impertinent to the

present action.  If they are to be used at trial, the Plaintiffs may present the

evidence later and the Defendants will have an opportunity to object to their

admissibility.  However, as a matter of pleading, the allegations do not further the

Plaintiffs' stated causes of action, and should be stricken from the pleadings.

For the foregoing reasons, the Defendants' motion to strike is GRANTED.

**V.    Conclusion**

For the foregoing reasons, the Defendants' [Dkt. 189] Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint or, in the Alternative, to Strike Portions of the Complaint is GRANTED IN PART and DENIED IN PART:

- **The Plaintiffs' substantive RICO claims against all Defendants are DISMISSED;**

- **The Plaintiff's conspiracy to violate RICO claims against all Defendants are DISMISSED;**

- **The Plaintiffs' claims for violations of the California Automatic Renewal Statute against the Trilegiant and E-Merchant Defendants are DISMISSED;**

- **The claims by Plaintiffs Reilly, Restrepo, Brian Schnabel, and Warfel against all Defendants are DISMISSED;**

- **The Defendants' motion to strike the Plaintiffs' CUTPA class action allegations is GRANTED;**

- **The Defendants' motion to Dismiss footnote 18 of the Complaint is GRANTED;**

- **The Defendants' motion to strike references to the Senate Report and prior settlement with the states' attorneys general is GRANTED.**

However, a few claims remain extant:

- **The Defendants' motion to dismiss the Plaintiffs' claims for CUTPA violations stemming from the refund mitigation strategy against the Trilegiant and E-Merchant Defendants is DENIED, but as to all other alleged CUTPA violations it is GRANTED;**

- **The Defendants' motion to dismiss the Plaintiffs' claims for unjust enrichment against the Trilegiant and E-Merchant Defendants is DENIED, but the motion to dismiss claims for unjust enrichment against the Credit Card Defendants is GRANTED;**

- **The Defendants' motion to dismiss the Plaintiffs' ECPA claims against Trilegiant, Affinion, and the E-Merchant Defendants brought by Plaintiffs Kelm, Pham, Reilly, Restrepo, Brian Schnabel, Warfel, and Williams is GRANTED, but the Defendants' motion to dismiss the ECPA claims against Trilegiant, Affinion, and the E-Merchant Defendants brought by Plaintiffs DiCarolis, Edward and Lucy Schnabel, Sumlin, and Timmcke is DENIED.**

**IT IS SO ORDERED.**

**_____/s/_____**
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: March 28, 2014**